# UNITED STATES *v.* LOUISIANA ET AL. (ALABAMA AND MISSISSIPPI BOUNDARY CASE)

No. 9, Orig.   Argued November 26, 1984—Decided February 26, 1985

BLACKMUN, J., delivered the opinion of the Court, in which all other Members joined, except MARSHALL, J., who took no part in the consideration or decision of the case.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Habicht,* and *Donald A. Carr.*

*Jim R. Bruce* argued the cause for defendant State of Mississippi. With him on the briefs were *Edwin Lloyd Pittman,* Attorney General, *Herber A. Ladner, Jr.,* and *Thomas Y. Page. Benjamin Cohen,* Special Assistant Attorney General, argued the cause for defendant State of Alabama. With him on the briefs were *Charles A. Graddick,* Attorney General, and *Robert A. Macrory,* Special Assistant Attorney General.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This is the latest chapter in the long-lasting litigation between the Federal Government and the States of the Gulf Coast concerning ownership of the seabed, minerals, and other natural resources underlying the Gulf of Mexico. The particular and narrow issue presented here is whether the waters of Mississippi Sound are inland waters. If the Sound constitutes inland waters, as the States of Alabama and Mississippi contend, then these States own the lands submerged under the Sound. If the Sound in substantial part does not constitute inland waters, as the Government contends, then the United States owns the lands submerged under several "enclaves" of high seas within the Sound. We conclude that Mississippi Sound qualifies as a historic bay, and that the waters of the Sound, therefore, are inland waters.

I

The Submerged Lands Act of 1953, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.,* confirms to each State title to and ownership of

---

*Norman C. Gorsuch,* Attorney General, *G. Thomas Koester,* Assistant Attorney General, *John Briscoe,* and *David Ivester* filed a brief for the State of Alaska as *amicus curiae.*

the lands beneath navigable waters within the State's boundaries. § 1311(a). The Act also confirms in each coastal State a seaward boundary three geographical miles distant from its coastline. § 1312. A State bordering on the Gulf of Mexico, however, may be entitled to a historic seaward boundary beyond three geographical miles and up to three marine leagues (approximately nine geographical miles) distant from its coastline. §§ 1301(b), 1312. The Act defines the term "coast line" as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." § 1301(c). The first part of this definition is relatively easy to apply. The second part—requiring determination of "the line marking the seaward limit of inland waters"—is more difficult to apply because the term "inland waters" is not defined in the Act.

In *United States* v. *Louisiana*, 363 U. S. 1 (1960), this Court determined, among other things, that the States of Alabama and Mississippi are not entitled under the Submerged Lands Act to a historic seaward boundary three marine leagues distant from their coastlines. Rather, the Court held, these two States are entitled, as against the United States, to all the lands, minerals, and other natural resources underlying the Gulf of Mexico, extending seaward from their coastlines for a distance of no more than three geographical miles. *Id.*, at 79–82, 83 (opinion); *United States* v. *Louisiana*, 364 U. S. 502, 503 (1960) (decree). The Court, however, did not express any opinion as to the precise location of the coastline from which the 3-mile belt is to be measured. 363 U. S., at 82, nn. 135 and 139. The Court merely noted, in accordance with the above-mentioned definition in § 2(c) of the Submerged Lands Act, 43 U. S. C. § 1301(c), that "the term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the

seaward limit of inland waters." 364 U. S., at 503. See also 363 U. S., at 83. The Court retained jurisdiction to entertain further proceedings, including proceedings to resolve any dispute in locating the relevant coastline. *Ibid.;* 364 U. S., at 504.

As has been noted, locating the coastline requires the determination of the seaward limit of "inland waters." Following the Court's decision in *United States* v. *Louisiana,* a disagreement arose between the United States and the States of Alabama and Mississippi concerning the status of Mississippi Sound as inland waters. The Sound is a body of water immediately south of the mainland of the two States. It extends from Lake Borgne at the west to Mobile Bay at the east, and is bounded on the south by a line of barrier islands. These islands, from west to east, are Isle au Pitre, Cat Island, Ship Island, Horn Island, Petit Bois Island, and Dauphin Island. The Sound is approximately 80 miles long and 10 miles wide.

The two States contend that the whole of Mississippi Sound constitutes "inland waters." Under this view, the coastline of the States consists of the lines of ordinary low water along the southern coasts of the barrier islands together with appropriate lines connecting the barrier islands. These latter lines mark the seaward limit of Mississippi Sound. The United States, on the other hand, denies the inland-water status of Mississippi Sound. Under its view, the coastline of the States generally consists of the lines of ordinary low water along the southern mainland and around each of the barrier islands.[1]

---

[1] The United States' position actually is somewhat more complicated. First, the United States concedes that Isle au Pitre may be treated as part of the mainland, and that a bay-closing line may be drawn from the eastern tip of Isle au Pitre to the eastern promontory of St. Louis Bay on the mainland. Thus, the waters of Mississippi Sound west of this bay-closing line are inland waters, and the bay-closing line forms part of the legal coastline

Under the States' view, then, the States own all the lands underlying Mississippi Sound, as well as the lands underlying the Gulf of Mexico extending seaward for a distance of three geographical miles from the southern coasts of the barrier islands and the lines connecting those islands. Under the United States' view, on the other hand, the States own only those lands underlying Mississippi Sound and the Gulf of Mexico that are within three geographical miles of the mainland coast or of the coasts of the barrier islands. There are several areas within Mississippi Sound that are more than three miles from any point on these coasts. Under the United States' view, those areas constitute "enclaves" or pockets of high seas, and the lands underlying them belong to the United States.

To resolve this dispute over the inland-water status of Mississippi Sound, the two States and the United States filed motions and cross-motions for the entry of a supplemental decree. The Court referred these pleadings to its Special Master, the Honorable Walter P. Armstrong, Jr., who already had been appointed in *United States* v. *Louisiana (Louisiana Boundary Case)*, 394 U. S. 11 (1969). See 444 U. S. 1064 (1980); 445 U. S. 923 (1980). See also 457 U. S. 1115 (1982). Following extended proceedings, the Special Master has submitted his Report to this Court.

---

of Mississippi. Second, the United States takes the position that if Dauphin Island at Mobile Bay is properly treated as part of the mainland—which the United States disputes—then a bay-closing line may be drawn from the western tip of Dauphin Island northwesterly to Point Aux Chenes on the mainland, just west of the Alabama-Mississippi boundary. Under this secondary or fall-back position of the United States, the waters of Mississippi Sound east of this bay-closing line are inland waters, and the bay-closing line forms part of the legal coastline of Alabama and Mississippi. Finally, there are several undisputed inland rivers and bays along the shores of Alabama and Mississippi, and, as a consequence, undisputed closing lines across the mouths of these rivers and bays that, in the Government's view, form part of the legal coastline of the States.

## II

As noted above, the Submerged Lands Act employs but does not define the term "inland waters." In *United States* v. *California*, 381 U. S. 139, 161–167 (1965), this Court observed that Congress had left to the Court the task of defining "inland waters" for purposes of the Submerged Lands Act. The Court for those purposes has adopted the definitions provided in the Convention on the Territorial Sea and the Contiguous Zone, [1964] 15 U. S. T. (pt. 2) 1607, T. I. A. S. No. 5639 (the Convention). 381 U. S., at 165. See also *Louisiana Boundary Case*, 394 U. S., at 35; *United States* v. *Maine (Rhode Island and New York Boundary Case)*, 469 U. S. 504, 513 (1985).

The Convention, however, uses terminology differing somewhat from the terminology of the Submerged Lands Act. In particular, the Convention uses the term "baseline" to refer to the "coast line," and it uses the term "territorial sea" to refer to the 3-geographical-mile belt extending seaward from the coastline. The territorial sea is one of the three zones into which, in international law, the sea is divided. The Court so explained in the *Louisiana Boundary Case:*

"Under generally accepted principles of international law, the navigable sea is divided into three zones, distinguished by the nature of the control which the contiguous nation can exercise over them. Nearest to the nation's shores are its inland, or internal waters. These are subject to the complete sovereignty of the nation, as much as if they were a part of its land territory, and the coastal nation has the privilege even to exclude foreign vessels altogether. Beyond the inland waters, and measured from their seaward edge, is a belt known as the marginal, or territorial, sea. Within it the coastal nation may exercise extensive control but cannot deny the right of innocent passage to foreign nations. Outside the territorial sea are the high seas, which are

international waters not subject to the dominion of any single nation." 394 U. S., at 22–23 (footnotes omitted).

Article 3 of the Convention provides the general rule for determining the "baseline":

> "Except where otherwise provided in these articles, the normal baseline for measuring the breadth of the territorial sea is the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State."

The Convention, however, provides several exceptions to the general rule pursuant to which Mississippi Sound might qualify as inland waters.

First, Article 4 of the Convention permits a nation to employ the method of straight baselines in delimiting its coastline. Article 4(1) provides in pertinent part:

> "In localities where the coast line is deeply indented and cut into, or if there is a fringe of islands along the coast in its immediate vicinity, the method of straight baselines joining appropriate points may be employed in drawing the baseline from which the breadth of the territorial sea is measured."

If the method of straight baselines were applied to the coast of Alabama and Mississippi, the coastline would be drawn by connecting the barrier islands, thus enclosing Mississippi Sound as inland waters. The Court has held, however, that the method of straight baselines is applicable only if the Federal Government has chosen to adopt it. See *Louisiana Boundary Case*, 394 U. S., at 72–73; *United States* v. *California*, 381 U. S., at 167–169. In the present case, the Special Master concluded that the United States has not adopted the straight baseline method.

Second, Article 7 of the Convention provides a set of rules for determining whether a body of water qualifies as inland

waters because it is a "juridical bay." Under Article 7(2), such a bay is defined to be "a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast." In addition, the area of the indentation must be "as large as, or larger than, that of the semicircle whose diameter is a line drawn across the mouth of that indentation." And the closing line of the bay must not exceed 24 miles. The Special Master concluded that Mississippi Sound satisfies these criteria and thus qualifies as a juridical bay. In reaching this conclusion, the Master determined that Dauphin Island was to be treated as part of the mainland. The closing line drawn from the easternmost point of Isle au Pitre to the westernmost point of Dauphin Island, connecting each of the intervening barrier islands, crosses water gaps totaling less than 24 miles in length.

Finally, Article 7(6) of the Convention indicates that a body of water can qualify as inland waters if it is a "historic bay." The Convention does not define the term "historic bay." The Special Master concluded that Mississippi Sound qualifies as a historic bay under the tests noted in *United States* v. *California*, 381 U. S., at 172, and *United States* v. *Alaska*, 422 U. S. 184, 189 (1975).

The Special Master, accordingly, recommended to this Court that a decree be entered in favor of Alabama and Mississippi.

The United States and the States of Alabama and Mississippi respectively filed exceptions to the Master's Report. The United States argued that the Master erred in concluding that Mississippi Sound is both a juridical bay and a historic bay; it claims that it is neither. Alabama and Mississippi agreed with those conclusions of the Special Master, but argued that there also were alternative grounds for concluding that Mississippi Sound constitutes inland waters. In particular, the States argued that their Acts of Admission established their boundaries along the southern coast of the barrier islands; that Mississippi Sound qualifies as inland

waters under the straight baseline method of Article 4 of the Convention and prior United States practice; that Mississippi Sound qualifies as a juridical bay regardless of the characterization of Dauphin Island as a "mainland headland"; and that even if the whole of Mississippi Sound is not a juridical bay, a smaller juridical bay exists at the eastern end of the Sound.

We have independently reviewed the record, as we must. See *Mississippi* v. *Arkansas*, 415 U. S. 289, 291–292, 294 (1974); *Colorado* v. *New Mexico*, 467 U. S. 310, 317 (1984); *Rhode Island and New York Boundary Case*, 469 U. S., at 506. Upon that review, we conclude that the Special Master correctly determined that Mississippi Sound is a historic bay. We therefore need not, and do not, address the exceptions presented by the States of Alabama and Mississippi or those exceptions of the United States that relate to the question whether Mississippi Sound qualifies as a juridical bay under Article 7 of the Convention.

## III

The term "historic bay"[2] is not defined in the Convention, and there is no complete accord as to its meaning. The Court has stated that a historic bay is a bay "over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations." *United States* v. *California*, 381 U. S., at 172. See also *United States* v. *Alaska*, 422 U. S., at 189; *Louisiana Boundary Case*, 394 U. S., at 23. The Court also has noted that there appears to be general agreement that at least three factors

---

[2] In this opinion, the term "historic bay" is used interchangeably with the term "historic inland waters." It is clear that a historic bay need not conform to the geographic tests for a juridical bay set forth in Article 7 of the Convention. See *Louisiana Boundary Case*, 394 U. S. 11, 75, n. 100 (1969). In this case, as in that one, we need not decide how unlike a juridical bay a body of water can be and still qualify as a historic bay, for it is clear from the Special Master's Report that, at minimum, Mississippi Sound closely resembles a juridical bay.

are to be taken into consideration in determining whether a body of water is a historic bay: (1) the exercise of authority over the area by the claiming nation; (2) the continuity of this exercise of authority; and (3) the acquiescence of foreign nations.   See *United States* v. *Alaska,* 422 U. S., at 189; *Louisiana Boundary Case,* 394 U. S., at 23–24, n. 27.   An authoritative United Nations study concludes that these three factors require that "the coastal State must have effectively exercised sovereignty over the area continuously during a time sufficient to create a usage and have done so under the general toleration of the community of States."   Juridical Regime of Historic Waters, Including Historic Bays 56, U. N. Doc. A/CN.4/143 (1962) (hereinafter Juridical Regime).[3]   In addition, there is substantial agreement that a fourth factor to be taken into consideration is the vital interests of the coastal nation, including elements such as geographical configuration, economic interests, and the requirements of self-defense.   See *id.,* at 38, 56–58; 1 Shalowitz, at 48–49.   See also *Fisheries Case (U. K.* v. *Nor.),* 1951 I. C. J. 116, 142.   In the present case, the facts establish that the United States effectively has exercised sovereignty over Mississippi Sound as inland waters from the time of the Louisiana Purchase in 1803 until 1971, and has done so without protest by foreign nations.

### A

Mississippi Sound historically has been an intracoastal waterway of commercial and strategic importance to the United States.   Conversely, it has been of little significance to foreign nations.   The Sound is shallow, ranging in depth generally from 1 to 18 feet except for artificially maintained channels between Cat Island and Ship Island leading to Gulf-

---

[3] The study explains that "no precise length of time can be indicated as necessary to build the usage on which the historic title must be based.   It must remain a matter of judgement when sufficient time has elapsed for the usage to emerge."   Juridical Regime, at 45.   See also 1 A. Shalowitz, Shore and Sea Boundaries 49 (1962) (hereinafter Shalowitz).

port, Miss., and between Horn Island and Petit Bois Island leading to Pascagoula, Miss. Outside those channels, it is not readily navigable for oceangoing vessels. Furthermore, it is a cul de sac, and there is no reason for an oceangoing vessel to enter the Sound except to reach the Gulf ports. The historic importance of Mississippi Sound to vital interests of the United States, and the corresponding insignificance of the Sound to the interests of foreign nations, lend support to the view that Mississippi Sound constitutes inland waters.[4]

Throughout most of the 19th century, the United States openly recognized Mississippi Sound as an inland waterway of importance for commerce, communications, and defense. Early in this period the Nation took steps to enhance and protect its interests in the Sound. On February 8, 1817, the House of Representatives listed among objects of national importance several "improvements requisite to afford the advantages of internal navigation and intercourse throughout the United States and its Territories," including "as a more distant object, a canal communication, if practicable, from the Altamaha and its waters to Mobile, and from thence to the Mississippi." H. R. Doc. No. 427, 14th Cong., 2d Sess., reprinted in 2 American State Papers 420, 422 (1834). This project ultimately became the Intracoastal Waterway through Mississippi Sound. On February 28, 1822, the House Committee on Military Affairs issued a Report that recognized the importance of the intracoastal communication between New Orleans and Mobile Bay through what an 1820

---

[4] United States Attorney General Edmund Randolph long ago employed similar reasoning in his opinion that Delaware Bay constitutes inland waters:

"These remarks may be enforced by asking, What nation can be injured in its rights by the Delaware being appropriated to the United States? And to what degree may not the United States be injured, on the contrary ground? It communicates with no foreign dominion; no foreign nation has ever before had a community of right in it, as if it were a main sea; under the former and present governments, the exclusive jurisdiction has been asserted." 1 Op. Atty. Gen. 32, 37 (1793).

letter reprinted in the Report described as "the little interior sea, comprised between the main and the chain of islands, bounded by Cat Island to the west, and Dauphin Island to the east." H. R. Rep. No. 51, 17th Cong., 1st Sess., 7.

Defense of this important waterway has been a longstanding concern of the United States. On April 20, 1836, the Senate passed a resolution calling upon the Secretary of War to survey the most eligible sites for a fortification suitable for the defense of Mississippi Sound and the commerce along it. See S. Rep. No. 490, 26th Cong., 1st Sess., 1 (1840). A subsequent resolution instructed the Senate Committee on Military Affairs to study the expediency of erecting a fort on the western extremity of Ship Island. See S. Rep. No. 618, 26th Cong., 1st Sess., 1 (1840). In response to an inquiry pursuant to this resolution, the War Department noted: "The defenses indicated would cover one of the channels leading from the gulf into the broad interior water communication extending from Lake Borgne to the bay of Mobile." *Id.*, at 2.[5]

Ship Island was reserved for military purposes by an Executive Order of August 30, 1847. In 1858, the War Department, responsive to an appropriation made by Congress, see the Act of Mar. 3, 1857, 11 Stat. 191, 192, authorized the building of a fort on the island. It was to be constructed at

---

[5] Ten years later, the Senate Committee on Military Affairs noted:

"The broad sheet of water which lies between the coast of Mississippi and the chain of islands parallel to it, is the channel of a commerce important in peace and indispensable in war. Through this passes the inland navigation which connects New Orleans and Mobile. This is the route of the mails and of a large part of the travel between the eastern and southwestern sections of the Union. Through this channel supplies for the naval station at Pensacola are most readily drawn from the great storehouse, the valley of the Mississippi, and its importance in this respect would be increased in a two-fold degree by the contingency of a maritime war: first, because a war would increase the requisite amount of supplies at that station; and, secondly, because it would greatly augment the difficulties of the more extended and exposed lines of communication by exterior navigation." S. Rep. No. 23, 31st Cong., 1st Sess., 2 (1850).

the island's west end, and to command the pass into Mississippi Sound between Ship and Cat Islands. Forty-eight cannons were ordered to arm the fort. During the War Between the States, the fort was occupied alternately by Union and Confederate troops. It was finally abandoned in 1875. In 1879, the United States erected a lighthouse on the central section of the island.[6]

The United States argues that this official recognition of Mississippi Sound as an internal waterway of commercial and strategic importance has no relevance to the Sound's status as a historic bay. It would support this argument with a citation to the 1962 United Nations study of historic waters. Juridical Regime, at 56–58. The cited pages of the study discuss the view taken by some authors and governments that such circumstances as geographic configuration, requirements of self-defense, or other vital interests of the coastal state may justify a claim to historic-bay status without the necessity of establishing long usage. The study notes, *id.*, at 58, that "[t]here is undoubtedly some justification for this view," but ultimately suggests that it does not make sense for "historic title" to be claimed in circumstances where the historic element is wholly absent. *Ibid.* The study, however, does not suggest that such circumstances as geographic configuration and vital interests are irrelevant to the ques-

---

[6] See generally Report of Special Master 38; Caraway, The Story of Ship Island, 1699–1941, 4 J. Miss. Hist. 76 (1942); Weinert, The Neglected Key to the Gulf Coast, 31 J. Miss. Hist. 269 (1969).

The United States argues that the fortification of Ship Island is relevant only to the United States' suppression of its civil insurrection. But the fort was planned and construction was begun years before the outbreak of the Civil War, and it was not abandoned until some years after the conclusion of that War. The United States further argues that the abandonment of the fort suggests a retreat from any claim of inland-water status for Mississippi Sound. But it seems just as likely, and perhaps more likely, that the fort eventually was abandoned because foreign nations completely acquiesced in the United States' assertion of sovereignty over the Sound, rendering the fort unnecessary.

tion whether a body of water is a historic bay and, indeed, it affirmatively indicates that such circumstances can fortify a claim to "historic bay" status that is based on usage.[7]

In any event, the evidence discussed above does not merely demonstrate that Mississippi Sound is presently important to vital interests of the United States. Rather, the evidence demonstrates that the United States historically and expressly has recognized Mississippi Sound as an important internal waterway and has exercised sovereignty over the Sound on that basis throughout much of the 19th century.

### B

The United States continued openly to assert the inland water status of Mississippi Sound throughout the 20th century until 1971. Prior to its ratification of the Convention on March 24, 1961,[8] the United States had adopted a policy of enclosing as inland waters those areas between the mainland and off-lying islands that were so closely grouped that no entrance exceeded 10 geographical miles.[9] This 10-mile rule

---

[7] The study cites Bourquin as a proponent of the view that "[t]he character of a bay depends on a combination of geographical, political, economic, historical and other circumstances." Juridical Regime, at 25 (translating and quoting Bourquin, Les Baies Historiques, in Mélanges Georges Sauser-Hall 42 (1952)). Bourquin explains:

"Where long usage is invoked by a State, it is a ground additional to the other grounds on which its claim is based. In justification of its claim, it will be able to point not only to the configuration of the bay, to the bay's economic importance to it, to its need to control the bay in order to protect its territory, etc., but also to the fact that its acts with respect to the bay have always been those of the sovereign and that its rights are thus confirmed by historical tradition." Juridical Regime, at 25–26.

[8] The Convention did not go into effect, however, until September 10, 1964, when the requisite number of nations had ratified it.

[9] The United States confirmed this policy in a number of official communications during the period from 1951 to 1961. See Report of Special Master 48–54. Also, the United States followed this policy in drawing the Chapman line along the Louisiana coast following the decision in *United States* v. *Louisiana*, 339 U. S. 699 (1950). See 1 Shalowitz, at 161. In a letter to Governor Wright of Mississippi, written on October 17, 1951,

represented the publicly stated policy of the United States at least since the time of the Alaska Boundary Arbitration in 1903. There is no doubt that foreign nations were aware that the United States had adopted this policy. Indeed, the United States' policy was cited and discussed at length by both the United Kingdom and Norway in the celebrated *Fisheries Case (U. K. v. Nor.)*, 1951 I. C. J. 116.[10] Nor is there any doubt, under the stipulations of the parties in this case, that Mississippi Sound constitutes inland waters under that view.

The United States contends that its earlier adoption of and adherence to a general formulation of coastline delimitation under which Mississippi Sound would have qualified as inland waters is not a sufficiently specific claim to the Sound as inland waters to establish it as a historic bay. In the present case, however, the general principles in fact were coupled with specific assertions of the status of the Sound as inland waters. The earliest such assertion in the 20th century occurred in *Louisiana v. Mississippi*, 202 U. S. 1 (1906). In that case, the Court determined the location of the boundary between Louisiana and Mississippi in the waters of Lake Borgne and Mississippi Sound. The Court described the Sound as "an inclosed arm of the sea, wholly within the United States, and formed by a chain of large islands, extending westward from Mobile, Alabama, to Cat Island. The openings from this body of water into the Gulf are neither of them six miles wide." *Id.*, at 48. The Court ruled that the doctrine of "thalweg" was applicable to determine the exact location of the boundary separating Louisiana from

---

Oscar L. Chapman, then Secretary of the Interior, indicated that if the Chapman line were extended eastward beyond the Louisiana border, it would enclose Mississippi Sound as inland waters.

[10] It is noteworthy that in the *Fisheries Case*, the International Court of Justice ruled that the consistent and prolonged application of the Norwegian system of delimiting inland waters, combined with the general toleration of foreign states, gave rise to a historic right to apply the system. See 1951 I. C. J., at 138–139.

Mississippi in Lake Borgne and Mississippi Sound. Under that doctrine, the water boundary between States is defined as the middle of the deepest or most navigable channel, as distinguished from the geographic center or a line midway between the banks. See *Texas* v. *Louisiana*, 410 U. S. 702, 709–710 (1973); *Louisiana* v. *Mississippi*, 466 U. S. 96, 99–101 (1984). The Court concluded that the "principle of thalweg is applicable," not only to navigable rivers, but also to "sounds, bays, straits, gulfs, estuaries and other arms of the sea." 202 U. S., at 50. The Court rejected the contention that the doctrine did not apply in Lake Borgne and Mississippi Sound because those bodies were "open sea." *Id.*, at 51–52. The Court noted that the record showed that Lake Borgne and the relevant part of Mississippi Sound are not open sea but "a very shallow arm of the sea, having outside of the deep water channel an inconsiderable depth." *Id.*, at 52. The Court clearly treated Mississippi Sound as inland waters, under the category of "bays wholly within [the Nation's] territory not exceeding two marine leagues in width at the mouth." *Ibid.*

The United States argues that the language in *Louisiana* v. *Mississippi* does not constitute a holding that Mississippi Sound is inland waters. It appears to us, however, that the Court's conclusion that the Sound is inland waters was essential to its ruling that the doctrine of thalweg was applicable. The United States also argues that it cannot be bound by the holding because it was not a party in that case. The significance of the holding for the present case, however, is not its effect as precedent in domestic law, but rather its effect on foreign nations that would be put on notice by the decision that the United States considered Mississippi Sound to be inland waters.

If foreign nations retained any doubt after *Louisiana* v. *Mississippi* that the official policy of the United States was to recognize Mississippi Sound as inland waters, that doubt must have been eliminated by the unequivocal declaration of

the inland-water status of Mississippi Sound by the United States in an earlier phase of this very litigation.[11] In a brief filed with this Court on May 15, 1958, the United States noted:

> "[W]e need not consider whether the language, 'including the islands' etc., would of itself include the water area intervening between the islands and the mainland (though we believe it would not), because it happens that all the water so situated in Mississippi is in Mississippi Sound, which this Court has described as inland water. *Louisiana* v. *Mississippi*, 202 U. S. 1, 48. The bed of these inland waters passed to the State on its entry into the Union. *Pollard's Lessee* v. *Hagan*, 3 How. 212." Brief for United States in Support of Motion for Judgment on Amended Complaint in *United States* v. *Louisiana*, O. T. 1958, No. 10 Orig., p. 254.[12]

Similarly, in discussing Alabama's entitlement to submerged lands, the United States conceded that "the water between the islands and the Alabama mainland is inland water; consequently, we do not question that the land under it belongs to the State." *Id.*, at 261.

The United States argues that the States cannot now invoke estoppel based on the Federal Government's earlier construction of *Louisiana* v. *Mississippi* as describing Mississippi Sound as inland waters. The United States points out that the Court in the *Louisiana Boundary Case*, 394

---

[11] The United States also acknowledged that Mississippi Sound constitutes inland waters in a letter written by the Secretary of the Interior to the Governor of Mississippi on October 17, 1951, confirming that the oil and gas leasing rights inside the barrier islands belonged to the State of Mississippi. Report of Special Master 42–44.

[12] In *United States* v. *Louisiana*, 363 U. S. 1 (1960), Alabama and Mississippi argued that language in their Acts of Admission and in other historic documents entitled them to ownership of all submerged lands located within three marine leagues of their coastlines. See *id.*, at 79–82.

U. S., at 73–74, n. 97, concluded that a similar concession with respect to Louisiana was not binding on the United States. As with the Court's holding in 1906 in *Louisiana* v. *Mississippi*, however, the significance of the United States' concession in 1958 is not that it has binding effect in domestic law, but that it represents a public acknowledgment of the official view that Mississippi Sound constitutes inland waters of the Nation.

## C

In addition to showing continuous exercise of authority over Mississippi Sound as inland waters, the States must show that foreign nations acquiesced in, or tolerated, this exercise. It is uncontested that no foreign government has ever protested the United States' claim to Mississippi Sound as inland waters. This is not surprising in light of the geography of the coast, the shallowness of the waters, and the absence of international shipping lanes in the vicinity. Scholarly comment is divided over whether the mere absence of opposition suffices to establish title. See *United States* v. *Alaska*, 422 U. S., at 189, n. 8, 199–200; *Louisiana Boundary Case*, 394 U. S., at 23–24, n. 27. In *United States* v. *Alaska*, this Court held that, under the circumstances of that case, mere failure to object was insufficient because it had not been shown that foreign governments knew or reasonably should have known of the authority being asserted. There is substantial agreement that when foreign governments do know or have reason to know of the effective and continual exercise of sovereignty over a maritime area, inaction or toleration on the part of the foreign governments is sufficient to permit a historic title to arise. See Juridical Regime, at 48–49. See also *Fisheries Case (U. K.* v. *Nor.),* 1951 I. C. J., at 138–139. Moreover, it is necessary to prove only open and public exercise of sovereignty, not actual knowledge by the foreign governments. See Juridical Regime, at 54–55. In the present case, the United States publicly and unequivocally stated that it considered Mississippi Sound to be inland waters. We conclude that under these

circumstances the failure of foreign governments to protest is sufficient proof of the acquiescence or toleration necessary to historic title.

## IV

The United States contends that, notwithstanding the substantial evidence discussed above of the Government's assertion of sovereignty over Mississippi Sound as inland waters, the States have failed to satisfy their burden of proof that Mississippi Sound is a historic bay. The United States relies on its recent disclaimer of the inland-water status of the Sound and on the absence of any evidence of actual exclusion from the Sound of foreign navigation in innocent passage. We find neither of these points persuasive.

## A

In April 1971, the United States for the first time publicly disclaimed the inland-water status of Mississippi Sound by publishing a set of maps delineating the 3-mile territorial sea and certain inland waters of the United States. These maps, which include the entire Gulf Coast, have been distributed to foreign governments in response to requests made upon the Department of State for documents delimiting the boundaries of the United States.

This Court repeatedly has made clear that the United States' disclaimer of historic inland-water status will not invariably be given decisive weight. In *United States* v. *California*, 381 U. S., at 175, the Court gave decisive effect to a disclaimer of historic inland-water status by the United States only because the case involved "questionable evidence of continuous and exclusive assertions of dominion over the disputed waters." The Court suggested, however, that such a disclaimer would not be decisive in a case in which the historic evidence was "clear beyond doubt." *Ibid.* The Court also suggested that "a contraction of a State's recognized territory imposed by the Federal Government in the name of foreign policy would be highly questionable." *Id.*, at 168. See *Geofroy* v. *Riggs*, 133 U. S. 258, 267 (1890). The Court

reiterated this latter theme in the *Louisiana Boundary Case*, where it stated:

"It is one thing to say that the United States should not be required to take the novel, affirmative step of adding to its territory by drawing straight baselines. It would be quite another to allow the United States to prevent recognition of a historic title which may already have ripened because of *past* events but which is called into question for the first time in a domestic lawsuit. The latter, we believe, would approach an impermissible contraction of territory against which we cautioned in *United States* v. *California*." 394 U. S., at 77, n. 104 (emphasis in original).

The maps constituting the disclaimer in the present case were published more than 2 years after the decree in the *Louisiana Boundary Case*, and 11 years after the decision in *United States* v. *Louisiana*, 363 U. S. 1 (1960). The Special Master concluded that "under the circumstances it is difficult to accept the disclaimer as entirely extrajudicial in its motivation." Report of Special Master 47. Rather, according to the Master, the disclaimer "would appear to be more in the nature of an attempt by the United States to prevent recognition of any pre-existing historic title which might already have ripened because of past events but which was called into question for the first time in a domestic lawsuit." *Ibid.*

We conclude that historic title to Mississippi Sound as inland waters had ripened prior to the United States' ratification of the Convention in 1961 and prior to its disclaimer of the inland-water status of the Sound in 1971. That disclaimer, issued while the Court retained jurisdiction to resolve disputes concerning the location of the coastline of the Gulf Coast States, is insufficient to divest the States of their entitlement to the submerged lands under Mississippi Sound.

## B

Finally, the United States argues that proof of historic inland-water status requires a showing that sovereignty was exerted to exclude from the area all foreign navigation in innocent passage. This argument is based on the principle that a coastal nation has the privilege to exclude innocent-passage foreign navigation from its inland waters, but not from its territorial sea. See *Louisiana Boundary Case*, 394 U. S., at 22. According to the United States, such exclusion is therefore the only conduct that conclusively demonstrates that the nation exercises authority over the waters in question as inland waters and not merely as territorial sea.

This rigid view of the requirements for establishing historic inland-water status is unrealistic and is supported neither by the Court's precedents [13] nor by writers on international law.[14] To the contrary, in advocating a flexible

---

[13] In *United States* v. *Alaska*, 422 U. S. 184, 197 (1975), the Court noted that to establish historic title to a body of water as inland waters, "the exercise of sovereignty must have been, historically, an assertion of power to exclude all foreign vessels and navigation." It is clear, however, that a nation can assert power to exclude foreign navigation in ways other than by actual resort to the use of that power in specific instances.

[14] One prominent writer has explained the "actes d'appropriation" necessary to establish effective exercise of sovereignty as follows:

"It is hard to specify categorically what kind of acts of appropriation constitute sufficient evidence: the exclusion from these areas of foreign vessels or their subjection to rules imposed by the coastal State which exceed the normal scope of regulation made in the interests of navigation would obviously be acts affording convincing evidence of the State's intent. It would, however, be too strict to insist that only such acts constitute evidence. In the Grisbadarna dispute between Sweden and Norway, the judgement of 23 October 1909 mentions that 'Sweden has performed various acts . . . owing to her conviction that these regions were Swedish, as, for instance, the placing of beacons, the measurement of the sea, and the installation of a light-boat, being acts which involved considerable expense and in doing which she not only thought that she was exercising her right but even more that she was performing her duty.'" 3 Gidel, Droit International Public de la Mer 633 (1934), translated and quoted in Juridical Regime, at 41.

approach to appraisal of the factors necessary to a valid claim of historic inland-waters status, two leading commentators have stated: "A relatively relaxed interpretation of the evidence of historic assertion and of the general acquiescence of other states seems more consonant with the frequently amorphous character of the facts available to support these claims than a rigidly imposed requirement of certainty of proof, which must inevitably demand more than the realities of international life could ever yield." M. McDougal & W. Burke, The Public Order of the Oceans 372 (1962). Similarly the 1962 United Nations study of historic waters notes that the requirement of effective exercise of sovereignty over the area by the appropriate action on the part of the claiming state

"does not, however, imply that the State necessarily must have undertaken concrete action to enforce its relevant laws and regulations within or with respect to the area claimed. It is not impossible that these laws and regulations were respected without the State having to resort to particular acts of enforcement. It is, however, essential that, to the extent that action on the part of the State and its organs was necessary to maintain authority over the area, such action was undertaken." Juridical Regime, at 43.

Thus, although a coastal nation has the privilege to exclude from its inland waters foreign vessels in innocent passage, the need to exercise that privilege may never arise. Indeed, in the present case, as the United States seems to concede, the record does not indicate that there ever was any occasion to exclude from Mississippi Sound foreign vessels in innocent passage. Tr. of Oral Arg. 16. This is not surprising since, as noted above, foreign nations have little interest in Mississippi Sound and have acquiesced willingly in the United States' express assertions of sovereignty over the Sound as inland waters. We conclude that the absence in the record of evidence of any occasion for the United States to have

exercised its privilege to exclude foreign navigation in innocent passage from Mississippi Sound supports rather than disproves the claim of historic title to the Sound as inland waters.

V

In sum, we conclude that the evidence discussed in the Report of the Special Master and in Part III above, considered in its entirety, is sufficient to establish that Mississippi Sound constitutes a historic bay. The exception of the United States to the Special Master's recommended ruling that the whole of Mississippi Sound constitutes historic inland waters is overruled. We repeat that we do not address the exceptions of Alabama, or those of Mississippi, or the exceptions of the United States that relate to the question whether Mississippi Sound qualifies as a juridical bay. The recommendations of the Special Master and his Report, to the extent they are consistent with this opinion, are respectively adopted and confirmed. The parties are directed promptly to submit to the Special Master a proposed appropriate decree for this Court's consideration; if the parties are unable to agree upon the form of the decree, each shall submit its proposal to the Master for his consideration and recommendation. Each party shall bear its own costs; the actual expenses of the Special Master shall be borne half by the United States and half by Alabama and Mississippi.

The Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as from time to time may be determined necessary or advisable to effectuate and supplement the forthcoming decree and the rights of the respective parties.

*It is so ordered.*

JUSTICE MARSHALL took no part in the consideration or decision of this case.