711 So.2d 1280 (1998)
John DARBIE, Petitioner,
v.
The STATE of Florida, Respondent.
No. 97-832.
District Court of Appeal of Florida, Third District.
May 20, 1998.
*1281 Greenman & Manz and Franklin D. Greenman, Marathon, for petitioner.
Robert A. Butterworth, Attorney General, and Richard L. Polin, Assistant Attorney General, for respondent.
Before SCHWARTZ, C.J., and JORGENSON and LEVY, JJ.
LEVY, Judge.
In November of 1995, John Darbie was charged in Monroe County Court with violating Section 370.092 (1995), Florida Statutes and Article X, Section 16(b)(2) of the Florida Constitution. Those provisions limit certain types of marine net fishing, specifically forbidding the use of a seine net in excess of 500 square feet at a location "in nearshore or inshore Florida waters." While not disputing that he used a seine net in excess of 500 square feet, Darbie claimed that he was not using it "in nearshore or inshore Florida waters" and, therefore, did not violate the charged provisions.[1]
Darbie filed a Motion to Dismiss in County Court, and argued at the hearing that he was using the seine net at a location significantly *1282 further than three miles from any point of land and, therefore, was not in violation of the Florida Constitution. At the time of the alleged violation, Darbie was on the Gulf of Mexico side of Florida, in an area of the Bay of Florida known as Bluefish Bank, which is 4.8 nautical miles (6 statute or land miles) from the nearest continually dry land mass, East Bahia Honda Key. Therefore, Darbie reasoned that if East Bahia Honda Key constituted the coastline, he was not in violation of the constitutional prohibition.
However, an area known as Horseshoe Bank lies midway between East Bahia Honda Key and Bluefish Bank. The State presented evidence that this area of land is surrounded by, and above, water at low-tide, but then is submerged during high-tide. The State argued that Horseshoe Bank met the definition of "coastline", and that Darbie was in violation of the charged provisions, since Bluefish Bank was less than three miles from Horseshoe Bank.
The evidence received at the County Court hearing included a chart published by the National Oceanic and Atmospheric Administration (NOAA) of the United States Department of Commerce, which indicated that Bluefish Bank, where Darbie was observed, was within three nautical miles of the coastline. As such, the trial court denied the Motion to Dismiss. Darbie entered a plea of "No Contest", while reserving the right to appeal the denial of his motion.
The Circuit Court, acting in its appellate capacity, issued an Order on Appeal affirming the County Court. The case is now proceeding here as a Petition for Writ of Certiorari, by Order of this Court, dated November 14, 1997.
The only issue involved in this petition is whether the Defendant placed a seine net in excess of 500 square feet within "nearshore or inshore Florida waters." For purposes of Article X, Section 16 of the Florida Constitution, "nearshore and inshore waters" are defined as "all Florida waters inside a line three miles seaward of the coastline along the Gulf of Mexico and inside a line one mile seaward of the coastline along the Atlantic Ocean." Id. § 16(c)(5). As such, we must determine what constitutes a "coastline" for purposes of Article X, Section 16 of the Florida Constitution.

I.
According to the Florida Constitution, the issue of what constitutes a coastline is determined pursuant to federal law.[2] Therefore, at the outset we note that our role is necessarily a limited one. Because the Florida Constitution requires us to apply federal law, we must make our determination of what constitutes the coastline consistent with federal precedent. Upon an examination of federal law, it is clear that, where Congress has provided a legislative delegation to an agency of the federal government, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by an administrative agency. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
As such, we first note that Congress has authorized the Secretary of Commerce "To provide charts and related information for the safe navigation of marine and air commerce ..." 33 U.S.C. § 883a (1994). Consistent with such an authorization, it is NOAA's implicit power to draw navigational charts which are consistent with that agency's mandate; to wit, to draft charts in accordance with federal law. Federal law has consistently defined the coastline as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea ..." 43 U.S.C. § 1301(c) (1994). See Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 3, 15 U.S.T. 1606 (international treaty defining the baseline for measuring the breadth of the territorial sea as "the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State."). See also United States v. California, 381 U.S. 139, 165, 85 S.Ct. 1401, 1415-16, 14 L.Ed.2d 296 (1965); United States v. States of Louisiana, Texas, Mississippi Alabama, and Florida, *1283 364 U.S. 502, 503, 81 S.Ct. 258, 259, 5 L.Ed.2d 247 (1960)(defining coastline as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.").
In the Chevron decision, the Supreme Court articulated a twostep analysis for determining whether an agency's construction of a statute it administers is entitled to deference. The Court stated:
First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter... If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted). See also Hussion v. Madigan, 950 F.2d 1546, 1550-51 (11th Cir.1992); Curse v. Director, Office of Workers' Comp. Prog., 843 F.2d 456, 460 (11th Cir.1988) Haynes Ambulance Serv., Inc. v. State of Alabama, 820 F.Supp. 590 (M.D.Ala. 1993). In the instant dispute, Congress has not directly spoken on the issue of whether a low-tide elevation is an appropriate land mass for determining the coastal boundaries of a State. The Chevron Court went on to state that:
Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
Chevron, 467 U.S. at 844, 104 S.Ct. at 2782 (footnote omitted).
In the instant case, Congress delegated the general authority to NOAA, through the Department of Commerce, to create charts for the navigation of marine vessels. See 33 U.S.C. § 883a(1994). Through this grant of authority, NOAA has drawn a chart reflecting its judgment that a low-tide elevation such as Horseshoe Bank is an appropriate land mass for determining the coastline of the State of Florida. Under clear federal precedent, we must give deference to the agency's determination unless we find that NOAA's determination of the coastline is "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. See also Nichols v. Southeast Health Plan of Alabama, Inc., 859 F.Supp. 553, 558 (S.D.Ala. 1993)(holding that deference to agency interpretation is appropriate when "the distinctive institutional capacities of the agency are called into play.").[3]

II.
Based on the foregoing, we are left only with the question of whether NOAA's determination, that a low-tide elevation can constitute the coastline, is based on a reasonable interpretation of federal law. See Chevron, 467 U.S. at 847, 104 S.Ct. at 2784. We hold that the NOAA chart, which measures the coastline from a low-tide elevation such as Horseshoe Bank, is a permissible and entirely reasonable interpretation of federal law.
Under the Submerged Lands Act, enacted in 1953, Congress defined the coastline to be *1284 "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." 43 U.S.C. § 1301(c) (1994); See also United States v. States of Louisiana, Texas, Mississippi, Alabama, and Florida, 364 U.S. 502, 503, 81 S.Ct. 258, 259, 5 L.Ed.2d 247 (1960)(same).
We note that the NOAA chart submitted as evidence in the court below clearly and indisputably indicates that the area in which the petitioner was observed is located inside the relevant three nautical mile line. This fact is important under the 1958 Convention on the Territorial Sea and the Contiguous Zone, a treaty to which the United States is a party and which became effective in 1964. See Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 3, 15 U.S.T. 1606. Under Article 3 of that Convention, "the normal baseline for measuring the breadth of the territorial sea is the low-water line along the coast as marked on large-scale charts recognized by the coastal State." Id. The NOAA chart introduced as evidence in the court below is such a qualifying chart, and it indicates that the area in which the petitioner was observed is located within three nautical miles of the coastline.[4]See generally 33 U.S.C. § 883a (1994) (authorizing the Secretary of Commerce "To provide charts and related information for the safe navigation of marine and air commerce ...").
NOAA's determination that Horseshoe Bank is an appropriate baseline from which to measure the coastline is buttressed by Article 11 of the 1958 Convention. That Section provides that:
1. A low-tide elevation is a naturally-formed area of land which is surrounded by and above water at low-tide but submerged at high tide. Where a low-tide elevation is situated wholly or partly at a distance not exceeding the breadth of the territorial sea from the mainland or an island, the low-water line on that elevation may be used as the baseline for measuring the breadth of the territorial sea.
2. Where a low-tide elevation is wholly situated at a distance exceeding the breadth of the territorial sea from the mainland or an island, it has no territorial sea of its own.
Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 11, 15 U.S.T. 1606.
As such, if Horseshoe Bank is located within the territorial sea of the State of Florida, it is appropriate to determine the State's coastline from that low-tide elevation. In interpreting the Submerged Lands Act[5], the United States Supreme Court determined that the states have title and jurisdiction over submerged lands offshore extending three nautical miles, except for Texas and Florida's coast in the Gulf of Mexico, where the state ownership extends nine nautical miles (or three marine leagues). See United States v. Maine, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975); United States v. Louisiana, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960); United States v. Florida, 363 U.S. 121, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960).
Therefore, since Horseshoe Bank is located within the territorial sea of the State of Florida, that low-tide elevation is an appropriate location from which to determine the coastline. Such an interpretation is consistent with the charts drawn by NOAA delineating the three-nautical mile line of the State.
The petitioner asserts that the three nautical mile line on the NOAA chart was improperly drawn, relying on Article 4 of the Convention. *1285 That section prohibits the drawing of baselines "to and from low-tide elevations, unless lighthouses or similar installations which are permanently above sea level have been built on them."[6] However, this language is completely consistent with the foregoing discussion. The Convention language prohibits the improper extension of a territory's coastline by essentially `jumping' from one low-tide elevation to another low-tide elevation, potentially ad infinitum. In the instant dispute, however, the State and NOAA have measured from a high-tide elevation (East Bahia Honda Key) to the nearest low-tide elevation (Horseshoe Bank) for the purpose of determining the coastline.
After our extensive consideration of relevant federal treaties, statutes, and case law, we hold that a "coastline" is the line where the shore along the Florida coast comes in direct contact with the open sea, at low-tide.[7] The determination that a low-tide elevation such as Horseshoe Bank can constitute a coastline is consistent with the NOAA chart, which draws the three nautical mile line from Horseshoe Bank.
Therefore, the Circuit Court, sitting in its appellate capacity, was correct in affirming the County Court's Order denying the petitioner's Motion to Dismiss. The petitioner has failed to establish, and nothing in our inquiry suggests, that the NOAA chart is an arbitrary and capricious interpretation of that federal law under which it is authorized to create navigational charts.
Accordingly, the Petition for a Writ of Certiorari directed to the Circuit Court's Order is denied.
NOTES
[1] The Florida Constitution states, in relevant part:

... no other type of net containing more than 500 square feet of mesh area shall be used in nearshore and inshore Florida waters. Additionally, no more than two such nets, which shall not be connected, shall be used from any vessel, and no person not on a vessel shall use more than one such net in nearshore and inshore Florida waters.
Art. X, § 16(b)(2), Fla. Const.
[2] Article X, § 16(c)(3), Fla. Const. defines "coastline" as "the territorial sea base line for the State of Florida established pursuant to the laws of the United States of America;"
[3] The face of the relevant NOAA chart itself indicates that the federal agency was interpreting federal law. Note X on the chart states:

The 12 nautical mile territorial sea was established by Presidential Proclamation 5928, December 27, 1988, and is also the outer limit of the U.S. contiguous zone for the application of domestic law. The 3 nautical mile line, previously identified as the outer limit of the territorial sea, is retained because the proclamation states that it does not alter existing State or Federal law. The 9 nautical mile natural resources boundary off Texas, the Gulf Coast of Florida, and Puerto Rico, and the 3 nautical mile line elsewhere remain the inner boundary of the., states' jurisdiction under the Submerged Lands Act.
United States Department of Commerce, National Oceanic and Atmospheric Administration, Chart representing Sombrero Key to Sand Key. (citation omitted).
[4] The terms "coastline" and "baseline" are interchangeable under United States Supreme Court precedent. While the term "baseline" is used in the Convention on the Territorial Sea and Contiguous Zone, the Supreme Court continues to refer to the Act when discussing the "coastline." See United States v. Alaska, ___ U.S. ___, ___, 117 S.Ct. 1888, 1894, 138 L.Ed.2d 231 (1997)("Specifically, the coastline from which a State measures its Submerged Lands Act grant corresponds to the "baseline" from which the United States measures its territorial sea under the Convention."); United States v. Louisiana, 470 U.S. 93, 94-96, 105 S.Ct. 1074, 1076-77, 84 L.Ed.2d 73 (1985); United States v. Maine, 469 U.S. 504, 512-14, 105 S.Ct. 992, 997-98, 83 L.Ed.2d 998 (1985). See also Op. Att'y Gen. Fla. 95-51 (1995).
[5] 43 U.S.C. § 1301 (1994).
[6] Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 4, 15 U.S.T. 1606.
[7] See 43 U.S.C. § 1301 (1994). See also, Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 3, 15 U.S.T. 1606. (defining the baseline for measuring the territorial sea as "the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State.").