718 So.2d 893 (1998)
STATE of Florida, Appellant,
v.
Bobby B. KIRVIN, Auburn Jones, James Taylor, Jr., Bob Nichols, Bob N. Nichols, Daniel Carter, James Taylor, Jr. and Bob Nichols, Appellees.
No. 97-3266.
District Court of Appeal of Florida, First District.
September 17, 1998.
*894 Robert Butterworth, Attorney General, and Jonathan A. Glogau, Assistant Attorney General, Tallahassee, for Appellant.
Douglas W. Gaidry of Watkins, Hevier and Gaidry, Apalachicola, for Appellees Kirvin and Jones.
Ronald A. Mowrey and L. William Porter, III, of Mowrey, Barrett & Minacci, P.A., Tallahassee, for Appellees Taylor, Nichols, Nichols, and Carter.
KAHN, Judge.
This case arises from criminal charges filed against the appellees because of their alleged failure to comply with provisions of article X, section 16, Florida Constitution, which places limitations on marine net fishing.[1] The county court granted appellees' motion to dismiss, finding article X, sections 16(b)(1), (b)(2), (c)(1), (c)(3), and (c)(5) unconstitutionally vague. Because we find the challenged provisions are not unconstitutionally vague, we reverse and remand this case for further proceedings. We note, however, that this case demonstrates some of the problems that arise when criminal provisions are enacted by direct plebiscite, without the benefit of debate, revision, or compromise.

I. FACTUAL BACKGROUND
On January 20, 1997, Florida Marine Patrol Officers issued citations to appellees Auburn *895 Jones and Bobby B. Kirvin. Jones and Kirvin were observed in Apalachicola Bay (in an area known as "Eleven Mile") striking a net in a circular fashion. As Jones and Kirvin retrieved the net, mullet were observed entangled in it. The officers reported that the net measured greater than 500 square feet. The officers found two small strips of nylon webbing measuring 56 inches wide sewn into the main portion of the net. Jones and Kirvin were initially charged with violations of article X, section 16(b)(1), Florida Constitution, and section 370.08(1), Florida Statutes.
Also on January 20, 1997, appellees James Taylor, Jr., Bob Nichols, Bob Nelson Nichols, and Daniel Carter were issued citations. Taylor, Nichols, Nichols, and Carter were also observed in Apalachicola Bay (in an area known as "Thirteen Mile"). They were operating four nets and all four nets had mullet gilled and entangled in the webbing. A small piece of 2-inch mesh was on the end of each net. The officers reported that all four nets measured larger than 500 square feet. Taylor, Nichols, Nichols, and Carter were initially charged with violating article X, section 16(b)(1), Florida Constitution, and sections 370.08(1) and 370.092(3)(a), Florida Statutes.
On January 29, 1997, Taylor and Bob Nichols were again issued citations. Taylor and Nichols were observed in a boat in Rattlesnake Cove, St. George Island, going around in circles and striking two nets; mullet were caught by being gilled in the nets. According to the citations, the nets were in excess of 500 square feet. Taylor and Nichols were initially charged with violations of article X, section 16(b)(1), Florida Constitution, and sections 370.08(1) and 370.092(3)(a), Florida Statutes.
Informations were subsequently filed against all six appellees also charging them with violating article X, section 16(b)(2), Florida Constitution, for using nets in excess of 500 square feet in the nearshore and inshore waters of Florida. Appellees each filed virtually identical motions to dismiss challenging the provisions of article X, section 16(b)(1), (b)(2), (c)(1), (c)(3), and (c)(5), Florida Constitution, as unconstitutionally vague; the State filed responses to these motions. Kirvin later filed a Motion for Consolidation of Cases for Purposes of Constitutional Challenge and Order, which the court granted. A hearing took place regarding the motion to dismiss and, by order rendered June 10, 1997, the county court granted the motion. The court found the challenged provisions unconstitutionally vague in violation of appellees' rights to due process. The State has now appealed.

II. PROCEDURE AND STANDARD FOR VAGUENESS CHALLENGE
Although not specifically set forth in the motions to dismiss or in the trial court's order, the parties agree that appellees raised a facial, as opposed to an as-applied, vagueness challenge to the constitutional provisions at issue. This court recently explained the procedure for evaluating the facial validity of a statute:
[I]f a defendant brings a facial challenge to a statute based on vagueness, and if the statute in question does not implicate constitutionally protected conduct, the court must determine whether the enactment is impermissibly vague in all of its applications. The court must not entertain countless hypothetical situations in which the statute might be considered vague, but rather the court must begin by applying the enactment to the facts of the case at hand. If the statute is not vague when considered under those facts, then by definition it cannot be vague in all of its applications.
This procedure eliminates the possibility the court will make an unnecessary declaration that a statute is invalid. If a statute clearly prohibits the conduct of the defendant in the case at hand, the court need not determine whether the statute clearly prohibits all conduct that might be within its scope.... [S]tatutes should not be declared facially invalid "simply because difficulty is found in determining whether certain marginal offenses fall within their language."
Travis v. State, 700 So.2d 104, 105-06 (Fla. 1st DCA 1997) (citations omitted), review denied, 707 So.2d 1128 (Fla.1998). The court *896 explained that although it had measured the statute at issue against the facts of the case, it had not engaged in an improper "as-applied" analysis. Id. at 106. The court further explained that, when the statute at issue does not purport to regulate any constitutionally protected activity, the constitutional analysis is the same in both a facial challenge and an as-applied challenge:
[T]he constitutional analysis is the same in this regard whether a statute is initially challenged on the ground that it is vague or whether a facially valid statute is challenged on the ground that it cannot be constitutionally applied to the defendant. In either case, the court must consider the facts.
Id. Finally, the court explained that the distinction between facial and as-applied challenges lies in the reach of the resulting court opinion:
[T]here is an important distinction between a challenge to the facial validity of a statute and a challenge to a statute as it applies to a given set of facts. When a defendant brings a vagueness challenge to a statute not implicating other constitutional rights, the court must use the facts as a starting point in the determination whether the statute is valid on its face. If the court agrees that the statute is void for vagueness, the statute cannot be applied in any case regardless of the facts. In contrast, when a defendant asserts a challenge to a statute as applied, the court must consider the facts to determine whether the statute can be fairly used to proscribe that defendant's conduct, and the result is not binding on other parties.
Id. Therefore, in determining whether the provisions at issue pass the test for facial vagueness, we must consider those provisions in light of the facts presented here.
Further, the supreme court has stated that the standard that applies in testing the validity of statutes also applies when testing the validity of constitutional provisions adopted through the initiative process. See Lane v. Chiles, 698 So.2d 260, 263 (Fla.1997) ("In most cases the rational basis standard is used to test the constitutional validity of a state statute. It follows logically that the same test would be used to determine the validity of a constitutional amendment adopted through the initiative process." (footnote omitted)). Accordingly, the test for vagueness of a constitutional provision is "whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practice." State v. Hagan, 387 So.2d 943, 945 (Fla.1980); see Brown v. State, 629 So.2d 841, 842 (Fla.1994) ("The standard for testing vagueness under Florida law is whether the statute gives a person of ordinary intelligence fair notice of what constitutes forbidden conduct."); Southeastern Fisheries Ass'n v. Department of Natural Resources, 453 So.2d 1351, 1353 (Fla.1984) ("A vague statute is one that fails to give adequate notice of what conduct is prohibited and which, because of its imprecision, may also invite arbitrary and discriminatory enforcement."); Travis, 700 So.2d at 105 ("A statute ... is unconstitutional on its face only if it is so vague that it fails to give adequate notice of any conduct that it proscribes."). In gauging the constitutionality of the provision, we bear in mind, "[i]f a constitutional amendment is a higher authority than a state statute, it stands to reason that it is entitled to an even greater degree of deference from the courts."[2]Lane, 698 So.2d at 263.

III. "GILL NETS OR OTHER ENTANGLING NETS"
We first consider the challenge to article X, sections 16(b)(1) and (c)(1), Florida *897 Constitution. As the State asserts, these provisions are not unconstitutionally vague. Article X, section 16(b)(1) places fishermen on notice that the use of gill nets or other entangling nets is prohibited in Florida waters. Section 16(c)(1) specifically defines "gill net" and "entangling net." The terms are not so vague that persons of common intelligence must guess at their meaning. See Southeastern Fisheries, 453 So.2d at 1354. Furthermore, as with the terms at issue in Hagan and Southeastern Fisheries, the terms "gill net" and "entangling net" have definite meanings within the fishing industry. See Southeastern Fisheries, 453 So.2d at 1354 (finding the term "fish trap" not so vague that persons of common intelligence must guess at its meaning and explaining that term has definite meaning within the fishing industry); Hagan, 387 So.2d at 946 (finding the terms "trawl net" and "trawling operation" have definite meanings within fishing industry). The provisions are sufficiently definite to be reasonably and uniformly enforced. See Southeastern Fisheries, 453 So.2d at 1354 (concluding that statute making certain types of fishtraps unlawful is sufficiently definite to be reasonably and uniformly enforced).
In arguing that these provisions are unconstitutionally vague, appellees assert that fish may become entangled in the wings of legal nets and thus fishermen, such as appellees, may be cited for illegally using a legal net. Appellees essentially argue that they were not reasonably on notice that their actions were illegal. They point out that, from the language of the provisions, "any net that gilled or entangled would be illegal" and the amendment "was intended as a limitation on marine net fishing, not a complete ban." They further point out that "the fish entangled on the date of Appellees' arrest were caught in the wing portions of the nets which contained larger meshes than those of the seine portions; the fish were not entangled in the seine portions of the nets." Appellees explain that the wing portions of a seine net are not subject to any mesh size restrictions and their nets "complied with the mesh size restrictions in the [Florida Administrative] Code as the meshes of the seine portions of each net did not exceed the Code's two-inch limitation." Appellees thus assert that their nets qualified as seine nets as a matter of law and, therefore, they may not be prosecuted for the use of gill nets or entangling nets.
As the State explains, however, even assuming appellees' nets technically complied with Rule 46-4.0081, Florida Administrative Code, which sets forth statewide net gear specifications, a jury could still conclude that those nets violated the constitutional provision because appellees used them to capture fish by causing the fish to become entangled or ensnared in the meshes of the nets, contrary to article X, sections 16(b)(1) and (c)(1). Although the fish were apparently not entangled in the relatively small "seine" portion of the net, they were entangled in the wings of the net and were thus entangled in the net. The definition of "entangling net" in the constitution does not specifically exclude seine nets, as it does hand thrown cast nets; therefore, a net containing seine mesh may qualify as "any other net which captures saltwater finfish, shellfish, or other marine animals by causing all or part of heads, fins, legs, or other body parts to become entangled or ensnared in the meshes of the net." Art. X, § 16(c)(1), Fla. Const.
Further, the State may properly seek to characterize the nets used by the fishermen in these types of cases by the manner of use. Indeed, these cases are not unlike criminal prosecutions for the use of burglary tools, drug paraphernalia, and deadly weapons, just to name a few examples. See, e.g., Green v. State, 604 So.2d 471, 473 (Fla.1992) ("Common household objects, which generally might have a useful and lawful purpose, may be classified as burglary tools if they are used with the intent to commit a burglary. For example, this Court has upheld convictions for possession of bolt cutters and screwdrivers as burglary tools." (citation and footnotes omitted)); Foster v. State, 286 So.2d 549, 551 (Fla.1973) ("It would be an unconstitutional actin excess of the State's police powerto criminalize the simple possession of a screwdriver, just as much as it would be to criminalize the possession of such items as ladies' hat pins, automobile tire irons kits, et cetera, without first requiring that they first be used as burglary tools. An *898 examination of the burglary tools statute reveals the potential for any number of common household tools to be `illegal' unless the statute is construed, in an appropriate case, such as this, to require that for such a tool to be `illegal', it must be used as a burglary toolthus becoming a facet of the burglary, breaking and entering transaction, etc." (footnote omitted)); Vincente v. State, 669 So.2d 1119, 1120 (Fla. 3d DCA 1996) (holding that evidence was sufficient to find screwdriver was deadly weapon where evidence showed defendant employed screwdriver as knife with which to stab victim); Dydek v. State, 400 So.2d 1255, 1257 (Fla. 2d DCA 1981) (holding that evidence was insufficient to sustain conviction for possession of drug paraphernalia, under law then in effect, where evidence indicated cigarette case was used only as container in which to carry or store certain instruments and there was no evidence that it could even possibly be used to administer controlled substance). The provision before us outlaws the use of entangling nets in Florida waters. Thus, the trier of fact may properly consider the manner of use, which in these cases was to gill mullet.
Finally, appellees argue that "if the state sought to ban the use of `seine' nets, it would have specifically enumerated `seine' nets as gill or entangling nets in section 16(c)(1)." Assuming that appellees' nets are, in truth, seine nets, just as such nets could have been specifically included in the definitions of "gill net" or "entangling net," so could they have been specifically excluded from those definitions as were hand thrown cast nets. We conclude, therefore, that a net containing seine mesh may qualify as "any other net which captures saltwater finfish, shellfish, or other marine animals by causing all or part of heads, fins, legs, or other body parts to become entangled or ensnared in the meshes of the net." Art. X, § 16(c)(1), Fla. Const. (emphasis added). The juries trying these cases may consider the nets themselves and their manner of use. Accordingly, the challenged provisions are not unconstitutionally vague and the county court erred in finding otherwise.

IV. "NEARSHORE AND INSHORE FLORIDA WATERS"
We next examine the county court's determination that the provisions contained in article X, sections 16(b)(2) and (c)(3) and (5), Florida Constitution, are unconstitutionally vague. The State argues that these provisions are not vague because, considering the standard definition of baseline provided in the Convention on the Territorial Sea and the Contiguous Zone, 15 U.S.T. 1606, April 29, 1958, "the three mile line shown on the standard nautical charts is necessarily, at all points, three miles from the territorial sea baseline." This constitutes the boundary of the "nearshore and inshore Florida waters." Accordingly, the State posits that fishermen are on notice of where the prohibitions of Article X, section 16 apply; i.e., if the fishermen are inside the boundary three nautical miles from the coastline, or the territorial sea base line, then the provisions apply. We agree.
Appellees present essentially two points in support of their assertion that the county court properly found the provisions unconstitutional. First, they argue that the State has produced no chart identifying the territorial sea base line and that "[c]onstruction of a line three miles from the territorial sea base line is not a simple matter for fishermen, or others, as the territorial sea base line does not follow what is commonly known as the `coastline.'" The question at this stage, however, is not whether the State can prove these cases to a jury's satisfaction. Such proof may perhaps be difficult. We have considered and approved here only the facial validity of the prohibition against certain fishing practices inside a boundary three nautical miles from the coastline or territorial sea base line.
Second, appellees complain that the State relies upon a line three nautical miles from the coastline, but the amendment "speaks of a line three miles, not nautical miles, from the coastline." The need for judicial construction, however, does not render a provision unconstitutionally vague. See, e.g., Perkins v. State, 576 So.2d 1310, 1313 (Fla.1991) ("We acknowledge some slight ambiguity in the meaning of the word *899 `involves,' albeit one clearly insufficient to void the statute for vagueness."); State v. Delgrasso, 653 So.2d 459, 463 (Fla. 2d DCA 1995) (finding that term "facility owner" in Resource Recovery and Management Act is sufficiently defined "when measured by common usage and understanding to convey to persons of ordinary intelligence who is included in its term" and thus such term does not render statute unconstitutionally vague); State v. Conner, 453 So.2d 863, 864 (Fla. 1st DCA 1984) (construing term "all classes of retail service stations" and finding provision containing term not unconstitutionally vague). We must determine, then, whether common usage and understanding of the term "mile," as it appears in the phrase "three miles seaward of the coastline," supports the State's view.
As we have noted, constitutional provisions are entitled to greater deference than statutes. See Lane, 698 So.2d at 263; Millender, 666 So.2d at 886. Further, the test for vagueness considers "whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practice." Hagan, 387 So.2d at 945. Applying these principles, we conclude that construing the term "mile" as "nautical mile" proves the only reasonable alternative particularly in light of "common understanding and practice." We note at the outset that just as the drafters of the provision could have included the word "nautical" to describe mile, so could they have included the word "statute."
As set forth above, the constitutional provision at issue prohibits the use of nets containing over 500 square feet of mesh area in "nearshore and inshore Florida waters." Art. X, § 16, Fla. Const. The drafters of the amendment provided a stair-step path to the ultimate definition of "nearshore and inshore Florida waters." The provision defines "nearshore and inshore Florida waters" as "all Florida waters inside a line three miles seaward of the coastline along the Gulf of Mexico and inside a line one mile seaward of the coastline along the Atlantic Ocean." Art. X, § 16(c)(5), Fla. Const. In defining "coastline," the provision relies on federal law: "`coastline' means the territorial sea base line for the State of Florida established pursuant to the laws of the United States of America." Art. X, § 16(c)(3), Fla. Const.; see Darbie v. State, 711 So.2d 1280, 1282 (Fla. 3d DCA 1998) ("According to the Florida Constitution, the issue of what constitutes a coastline is determined pursuant to federal law."); Op. Att'y Gen. Fla. 95-51 (1995). Thus, the boundary of the area in which the described nets are prohibited depends on the location of the "coastline," or the territorial sea base line, and the measurement of "three miles" seaward therefrom.
The "territorial seas" are "those waters adjacent to a state's coast and subject to its sovereignty" as opposed to the "high seas" which are "those waters lying seaward of the territorial seas and subject to the sovereignty of no state." United States v. Postal, 589 F.2d 862, 868 (5th Cir.), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); see, e.g., 33 C.F.R. § 2.05-1(a) ("Except as provided in paragraphs (b) and (c) of this section, `high seas' means all waters which are neither territorial seas nor internal waters of the United States or of any foreign country."); 46 C.F.R. § 25.26-1 ("High seas means the waters beyond a line three nautical miles seaward of the Territorial Sea Baseline as defined in 33 CFR 2.05-10."). The limits of the "territorial sea" are addressed in the Convention on the Territorial Sea and the Contiguous Zone by reference to measurement from a baseline. Specifically, Article 3 of the Convention provides that "the normal baseline for measuring the breadth of the territorial sea is the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State." Article 4 of the Convention addresses how such baselines should be drawn and Article 6 provides that "[t]he outer limit of the territorial sea is the line every point of which is at a distance from the nearest point of the baseline equal to the breadth of the territorial sea."
Thus, although the Convention contains no specific definition of the term "territorial sea base line," it defines the term indirectly by referencing a "baseline" for use in measuring the limits of the territorial sea. In any event, the Code of Federal Regulations does *900 contain a definition of "territorial sea baseline." It defines "territorial sea baseline" as "the delimitation of the shoreward extent of the territorial seas of the United States drawn in accordance with principles, as recognized by the United States, of the Convention on the Territorial Sea and the Contiguous Zone, 15 U.S.T. 1606." 33 C.F.R. § 2.05-10. In addition, although the Convention does not mention whether the measurement of the territorial sea from established baselines is accomplished in nautical miles or statute miles, the Code of Federal Regulations provides that "[w]ith respect to the United States, `territorial seas' means the waters within the belt, 3 nautical miles wide, that is adjacent to its coast and seaward of the territorial sea baseline." 33 C.F.R. § 2.05-5(a) (emphasis added).
From the foregoing, we conclude that the term "territorial sea" is a term of art. Although some federal cases indicate that the territorial sea extends three miles from the coastline, it actually extends three nautical, or geographical, miles from the coastline.[3]See, e.g., 43 U.S.C.A. § 1312 (West 1986) (defining seaward boundary of each coastal state as "a line three geographical miles distant from its coast line"); 33 C.F.R. § 2.05-5(a) (defining "territorial seas" as quoted above). Compare United States v. Postal, 589 F.2d 862, 869 (5th Cir.1979), and Anderson Seafoods, Inc. v. Graham, 529 F.Supp. 512, 514 (N.D.Fla.1982) ("Florida's seaward boundary is defined by the line three miles seaward from its coastline."), with United States v. Florida, 425 U.S. 791, 792, 96 S.Ct. 1840, 48 L.Ed.2d 388 (1976) (finding the State of Florida, as against the United States, entitled to "all the lands, minerals, and other natural resources underlying the Gulf of Mexico extending seaward a distance of 3 marine leagues from its coastline or its historic coastline, whichever is landward, but for not less than 3 geographic miles from its coastline"). Similarly, some federal regulations also use the term "mile" for "nautical mile" when referring to the same boundary. Compare 33 C.F.R. §§ 151.51, .1006, .1504 (Coast Guard regulations explaining that Exclusive Economic Zone extends 200 miles from territorial sea baseline) with 33 C.F.R. §§ 154.1020, 155.1020 (Coast Guard regulations explaining that Exclusive Economic Zone extends 200 nautical miles from territorial sea baseline) and 50 C.F.R. § 600.10 (Wildlife and Fisheries regulation explaining that Exclusive Economic Zone extends 200 nautical miles from territorial sea baseline). Thus, when referring to the territorial sea or the territorial sea baseline, the term "mile" is used interchangeably with the term "nautical mile" with some regularity. Accordingly, given "common understanding and practice," the term "miles" as used in article X, section 16 refers to "nautical miles." This determination is quite consistent with the Third District's examination of federal law in order to determine the location of the "coastline" as referenced by the provision. See Darbie, 711 So.2d at 1282.
As additional support for this conclusion, we note that the Attorney General of Florida has determined that the distance referenced in article X, section 16 should be measured in nautical, or geographical, miles. As explained in Attorney General Opinion 95-51, in the Submerged Lands Act of 1953, Congress defined "coast line" as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." 43 U.S.C.A. § 1301(c) (West 1986). Congress then definitively conferred title to the submerged lands and natural resources within the states' boundaries to the states, relinquishing all right, title, and interest of the United States. 43 U.S.C.A. § 1311(a), (b) (West 1986). Congress defined the seaward boundary of the coastal states as "a line three geographic miles distant from its coast line...." 43 U.S.C.A. § 1312; see 43 U.S.C.A. § 1301(b) (West Supp.1998) (defining "boundaries" to include "the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union ... but in no event *901 shall the term `boundaries' or the term `lands beneath navigable waters' be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico....").
As further explained in the opinion, and as explained above, the Convention on the Territorial Sea and Contiguous Zone uses the term "baseline," instead of "coast line," in measuring the territorial sea. See Op. Att'y Gen. Fla. 95-51; see also United States v. Alaska, 521 U.S. 1, ____, 117 S.Ct. 1888, 1893, 138 L.Ed.2d 231 (1997) ("[T]he coastline from which a State measures its Submerged Lands Act Grant corresponds to the `baseline' from which the United States measures its territorial sea under the Convention."); United States v. Louisiana, 470 U.S. 93, 98, 105 S.Ct. 1074, 84 L.Ed.2d 73 (1985) ("[T]he Convention uses the term `baseline' to refer to the `coast line,' and it uses the term `territorial sea' to refer to the 3-geographical-mile belt extending seaward from the coastline."). Specifically, Article 3 of the Convention defines the "baseline" for measuring the territorial sea as "the low water line along the coast as marked on large-scale charts officially recognized by the coastal State."
In the above referenced opinion, the attorney general applied the Submerged Lands Act and the Convention in construing article X, section 16 and reached the following results:
A. "Coastline" is the low water line that meets the shore along the coast of Florida which is in direct contact with the open sea. A coastline can never begin in open water; a coastline, in plain terms, is where the water meets the land.
B. "Florida waters" are those waters in the Atlantic Ocean out to three (3) geographic miles from the coastline and in the Gulf of Mexico out to three (3) marine leagues, or 9 geographic miles, or approximately 10.376 statute miles, from the coastline.
C. "Nearshore and inshore waters" are those State waters within one (1) geographic mile of the coastline in the Atlantic Ocean and three (3) geographic miles of the coastline in the Gulf of Mexico.
The attorney general then concluded:
[T]he prohibitions of Article X, section 16(b)(2), Florida Constitution, would apply to waters inside a one (1) geographic mile limit in the Atlantic Ocean and inside a three (3) geographic mile limit in the Gulf of Mexico measured from the low water line. This distance corresponds to 1.15 miles, as measured on land, in the Atlantic Ocean; and 3.95 miles, as measured on land, in the Gulf of Mexico[4].
Thus, the outer boundary in the Gulf of Mexico is be 3.45 statute miles from the coastline. All Florida waters inside this line are subject to the prohibitions of article X, section 16(b)(2).

V. CONCLUSION
We find that the challenged provisions of article X, section 16 are not facially vague. When the charges in a case concern violations of section 16(b)(1), the State's evidence must include proof that the fishermen were using prohibited gill or entangling nets and this evidence may involve characterizing the nets according to their manner of use. Further, when the charges concern violations of section 16(b)(2), the State's case must include proof that the fishermen were using prohibited nets in "nearshore and inshore Florida waters," e.g., in waters three nautical miles seaward of the coastline or territorial sea base line in the Gulf of Mexico.
REVERSED and REMANDED for further proceedings.
MINER and ALLEN, JJ., concur.
NOTES
[1] Article X, section 16, Florida Constitution, provides, in pertinent part:

(b) For the purpose of catching or taking any saltwater finfish, shellfish or other marine animals in Florida waters:
(1) No gill nets or other entangling nets shall be used in any Florida waters;
(2) In addition to the prohibition set forth in (1), no other type of net containing more than 500 square feet of mesh area shall be used in nearshore and inshore Florida waters. Additionally, no more than two such nets, which shall not be connected, shall be used from any vessel, and no person not on a vessel shall use more than one such net in nearshore and inshore Florida waters.
(c) For purposes of this section:
(1) "gill net" means one or more walls of netting which captures saltwater finfish by ensnaring or entangling them in the meshes of the net by the gills, and "entangling net" means a drift net, trammell net, stab net, or any other net which captures saltwater finfish, shellfish, or other marine animals by causing all or part of heads, fins, legs, or other body parts to become entangled or ensnared in the meshes of the net, but a hand thrown cast net is not a gill net or an entangling net;
(2) "mesh area" of a net means the total area of netting with the meshes open to comprise the maximum square footage. The square footage shall be calculated using standard mathematical formulas for geometric shapes. Seines and other rectangular nets shall be calculated using maximum length and maximum width of the netting. Trawls and other bag type nets shall be calculated as a cone using the maximum circumference of the net mouth to derive the radius, and the maximum length from the net mouth to the tail end of the net to derive the slant height. Calculations for any other nets or combination type nets shall be based on the shapes of the individual components;
(3) "coastline" means the territorial sea base line for the State of Florida established pursuant to the laws of the United States of America.
(4) "Florida waters" means the waters of the Atlantic Ocean, the Gulf of Mexico, the Straits of Florida, and any other bodies of water under the jurisdiction of the State of Florida, whether coastal, intracoastal or inland, and any part thereof; and
(5) "nearshore and inshore Florida waters" means all Florida waters inside a line three miles seaward of the coastline along the Gulf of Mexico and inside a line one mile seaward of the coastline along the Atlantic Ocean.
[2] The limited marine net fishing amendment, a provision that creates a constitutional crime, was adopted by Florida's electorate on November 8, 1994, by a vote of 71.7% in favor and 28.3% opposed. According to the Florida Department of State, the amendment passed in all Florida counties except the following, all of which are in the territorial jurisdiction of this court: Bay, Calhoun, Dixie, Franklin, Gadsden, Gilchrist, Gulf, Hamilton, Holmes, Jackson, Jefferson, Lafayette, Levy, Liberty, Madison, Nassau, Suwannee, Taylor, Union, Wakulla, Walton, and Washington. See Florida Department of State, Division of Elections Internet Site . Eleven of the fifteen coastal counties in our district voted against the amendment; the amendment passed overwhelmingly in the larger metropolitan areas of central and south Florida.
[3] Even though higher authorities use the terms "nautical mile" and "geographical mile" interchangeably, they are not exactly the same. See Op. Att'y Gen. Fla. 95-51 n. 14 (explaining that a geographic mile is slightly longer than a nautical mile).
[4] The reference to "3.95 miles" as the outer boundary in the Gulf of Mexico appears to be a typographical or scrivener's error as the opinion correctly explains earlier that "a `geographic' or `nautical' mile is 1.15 `statute' or `English' miles." Op. Att'y Gen. Fla. 95-51 n. 14.