## UNITED STATES *v.* MAINE ET AL.

No. 35, Orig.   Argued December 12, 1985—Decided February 25, 1986

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except MARSHALL, J., who took no part in the consideration or decision of the case.

*Henry Herrmann,* Special Assistant Attorney General of Massachusetts, argued the cause for defendant Commonwealth of Massachusetts. With him on the briefs were *Francis X. Bellotti,* Attorney General, and *William L. Pardee,* Assistant Attorney General.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the brief were *Acting Solicitor General Fried, Assistant Attorney General Habicht,* and *Michael W. Reed.*

JUSTICE STEVENS delivered the opinion of the Court.

The question now before the Court is whether Nantucket Sound qualifies as "internal waters" of the Commonwealth of Massachusetts rather than partly territorial sea and partly high seas as the United States contends. We agree with the Special Master's conclusion that the Commonwealth's claim should be rejected.

I

Pursuant to an earlier decree of this Court,[1] the United States and Massachusetts in 1977 filed a joint motion for sup-

---

[1] In 1968 the United States invoked our original jurisdiction to quiet title to the seabed along the coast of the Atlantic Ocean. In 1975 we entered a decree affirming the title of the United States to the seabed more than three geographic miles seaward of the coastline, and of the States to the seabed within the 3-geographic-mile zone. *United States* v. *Maine,* 423 U. S. 1 (1975). See also *United States* v. *Maine,* 420 U. S. 515 (1975). In

plemental proceedings to determine the location of the Massachusetts coastline. After our appointment of a Special Master, 433 U. S. 917 (1977), the parties agreed on a partial settlement, which we approved in 1981. 452 U. S. 429. Left unresolved was the status of Vineyard Sound and Nantucket Sound, a dispute which gave rise to extensive hearings before the Special Master. The Master concluded that Vineyard Sound is a "historic bay" and therefore a part of the inland waters of Massachusetts. However, he reached a contrary conclusion concerning Nantucket Sound. Explaining that the decision concerning Vineyard Sound has only minimal practical significance,[2] the United States has taken no exception to the Master's report. Massachusetts, however, has excepted to that part of the report concerning Nantucket Sound. Specifically, although Massachusetts acquiesces in the determination that the doctrine of "historic title" does not support its claim, it continues to maintain that it has "ancient title" to Nantucket Sound.

Nantucket Sound is a relatively shallow body of water south of Cape Cod, northeast of the island of Martha's Vineyard, and northwest of the island of Nantucket. Massachusetts contends that the English Crown acquired title to this territory as a result of discovery and occupation by colonists in the early 17th century and that it succeeded to the Crown's title by virtue of various Royal Charters or by the Treaty of Paris, which ended the Revolutionary War.[3]

---

that decree we reserved jurisdiction which either the "United States or any defendant State [could] invoke . . . by filing a motion in this Court for supplemental proceedings." 423 U. S., at 2.

[2] According to the Solicitor General, all but 1,000 acres of the submerged lands of Vineyard Sound belong to the Commonwealth of Massachusetts as underlying territorial waters, even under its view that those waters are not inland.

[3] In particular, the Commonwealth points to the charter granted in 1664 by King Charles II to the Duke of York conveying title to New York, New Jersey, and most of New England, cf. *Martin* v. *Waddell*, 16 Pet. 367, 413–414 (1842); *Mahler* v. *Norwich & N. Y. Transp. Co.*, 35 N. Y. 352, 355

To prove that Great Britain acquired title to Nantucket Sound which it could pass to Massachusetts, much of the evidence presented to the Special Master concerned whether Nantucket Sound would have been considered "county waters" under English law in the 17th century. Under the "county waters" doctrine, waters *"inter fauces terrae"* or landward of an opening "between the jaws of the land" could be subject to the jurisdiction of the littoral county rather than the Admiral if the jaws were close enough to each other to satisfy a somewhat ambiguous line-of-sight test. Under Lord Coke's version of the test a person standing on one jaw must be able to "see what is done" on the other jaw;[4] under Lord Hale's more expansive version, it is merely necessary that "a man may reasonably discern between shore and shore."[5]

---

(1866), and to the charter granted in 1691 by the English monarchs William and Mary to the colonists of Massachusetts consolidating into "one reall Province by the Name of Our Province of the Massachusetts Bay in New England" the territories and colonies that were then commonly known as Massachusetts Bay, New Plymouth, "the Province of Main," and the territory called Accadia or Nova Scotia, see Mass. Ex. 45, p. 8. Alternatively, Massachusetts asserts that it acquired sovereignty over the area by virtue of the Treaty of Paris signed in 1783. Cf. *Manchester* v. *Massachusetts*, 139 U. S. 240, 256–257 (1891); *Mahler* v. *Norwich & N. Y. Transp. Co.*, 35 N. Y., at 356.

[4] 4 E. Coke, Institutes 140 (6th ed. 1681) ("It is no part of the Sea, where one may see what is done of the one part of the water, and of the other, as to see from one Land to the other, that the Coroner shall exercise his office in this case, and of this the Country may have knowledge; whereby it appeareth that things done there are triable by the Country (that is, by Jury) and consequently not in the Admiral Court").

[5] M. Hale, De Jure Maris et Brachiorum ejusdem, cap. iv (1667), reprinted in R. Hall, Essay on the Rights of the Crown and the Privileges of the Subject in the Sea Shores of the Realm, App. vii (2d ed. 1875) ("That arm or branch of the sea, which lies within the *fauces terrae*, where a man may reasonably discerne between shore and shore, is or at least may be within the body of a county, and therefore within the jurisdiction of the sheriff or coroner").

The relevant jaws of land in this case are the southern tip of Monomoy Island, which extends south from the elbow of Cape Cod, and the northern tip of Nantucket Island. At the present time, those two jaws are 9.2 nautical miles apart, but the distance may have been greater in colonial times. In any event, the parties agree that the distance was too great to satisfy Lord Coke's version of the test. Whether it would meet Lord Hale's test depends, in the opinion of the Master, on whether the Commonwealth's burden of proof is merely to persuade by a preponderance of the evidence or by evidence that is "clear beyond doubt." For purposes of our decision, we put to one side the parties' argument about the burden and assume that Lord Hale's test is satisfied.[6] On the assumption that Nantucket Sound could have been considered "county waters" under the common law of England in the 17th century, we nevertheless conclude that Massachusetts cannot prevail under the doctrine of "ancient title" on which it relies.

## II

This Court has consistently followed principles of international law in fixing the coastline of the United States.[7] We

---

[6] The Special Master rested his conclusion that Massachusetts had to prove its claim "clear beyond doubt" on two cases of this Court and three reports of Special Masters in original jurisdiction cases. See *Louisiana Boundary Case*, 394 U. S. 11, 77 (1969); *United States* v. *California*, 381 U. S. 139, 175 (1965); Report of the Special Master, O. T. 1983, No. 35 Orig., p. 11; Report of the Special Master, O. T. 1974, No. 9 Orig., pp. 18–19; Report of the Special Master, O. T. 1973, No. 52 Orig., p. 42. Cf. *United States* v. *Louisiana (Alabama and Mississippi Boundary Case)*, 470 U. S. 93, 111 (1985).

Although the Master's conclusion regarding the burden of proof was the focus of the Commonwealth's opening brief, we find it unnecessary to address the issue given our disposition of the case. Whatever the measure of proof, Massachusetts concedes that it bears the risk of nonpersuasion. See Brief for Defendant Massachusetts 7.

[7] See *United States* v. *California*, 381 U. S., at 161–167. See also *Alabama and Mississippi Boundary Case*, 470 U. S., at 98; *United States* v. *Maine (Rhode Island and New York Boundary Case)*, 469 U. S. 504, 513

have relied in particular on the Convention on the Territorial Sea and Contiguous Zone, [1958] 15 U. S. T. 1607, T. I. A. S. No. 5639.[8] The Convention provides that the sovereignty of a state extends to "internal waters." Art. 1. The Convention also contains a set of rules delimiting those waters. Generally speaking, Article 5(1) defines "internal waters" as those waters landward of a baseline which Article 3 in turn defines as "the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State." Of importance to this case, the Convention also includes as a state's "internal waters" those waters enclosed in "bays" as defined in Article 7. Most of the rules in this Article identify the criteria for defining "juridical bays," but Article 7(6) further includes as "bays" "so-called 'historic' bays" and waters landward of baselines marked when "the straight baseline system provided for in Article 4 is applied."

In this case, Massachusetts relies exclusively on the provision recognizing "historic bays," for it is agreed both that the United States has legitimately eschewed the straight baseline method for determining its boundaries,[9] and that Nantucket Sound does not qualify as a juridical bay. Because "historic bay" is not defined in the Convention, we have previously relied on a United Nations study authored by the U. N. Secretariat and entitled Juridical Regime of Historic Waters, Including Historical Bays, [1962] 2 Y. B. Int'l L. Comm'n 1, U. N. Doc. A/CN.4/143 (1962) (hereinafter Juridical Regime). See *United States* v. *Louisiana (Alabama and*

(1985); *United States* v. *Alaska*, 422 U. S. 184, 188–189 (1975); *Louisiana Boundary Case*, 394 U. S., at 35.

[8] See *Louisiana Boundary Case, id.*, at 21 (Convention contains " 'the best and most workable definitions available' " (quoting *United States* v. *California*, 381 U. S., at 165)).

[9] We have previously held that the decision to use the straight baseline system provided for in Article 4 of the Convention rests with the Federal Government. See *Alabama and Mississippi Boundary Case*, 470 U. S., at 99; *Louisiana Boundary Case*, 394 U. S., at 72–73; *United States* v. *California*, 381 U. S., at 167–168.

*Mississippi Boundary Case)*, 470 U. S. 93, 101–102 (1985). That study prescribes the three factors of dominion, continuity, and international acquiescence recognized in our own cases for identifying a "historic bay."[10]   The Commonwealth submits that the three-part test is actually the standard for finding "historic *title*" and that a different doctrine—the doctrine of "ancient title"—is also a sufficient basis for identifying a "historic *bay*" under Article 7(6) of the Convention. According to Massachusetts, "historic title" is the maritime counterpart of title acquired by adverse possession.   It is prescriptive in character because it arises as a result of a state's exercise of dominion over water that would otherwise constitute either high seas or territorial sea in which all ships enjoy the right of innocent passage.   Before this Court, Massachusetts no longer claims "historic title" as it uses the term.   Brief for Defendant Massachusetts 4; Reply Brief for Defendant Massachusetts 22.

The Commonwealth instead relies entirely on a claim of "ancient title."   This is the first case in which we have been

_____

[10] "The term 'historic bay' is not defined in the Convention, and there is no complete accord as to its meaning.   The Court has stated that a historic bay is a bay 'over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations.'   *United States* v. *California,* 381 U. S., at 172.   See also *United States* v. *Alaska,* 422 U. S., at 189; *Louisiana Boundary Case,* 394 U. S., at 23.   The Court also has noted that there appears to be general agreement that at least three factors are to be taken into consideration in determining whether a body of water is a historic bay: (1) the exercise of authority over the area by the claiming nation; (2) the continuity of this exercise of authority; and (3) the acquiescence of foreign nations.   See *United States* v. *Alaska,* 422 U. S., at 189; *Louisiana Boundary Case,* 394 U. S., at 23–24, n. 27.   An authoritative United Nations study concludes that these three factors require that 'the coastal State must have effectively exercised sovereignty over the area continuously during a time sufficient to create a usage and have done so under the general toleration of the community of States.'   Juridical Regime of Historic Waters, Including Historic Bays 56, U. N. Doc. A/CN.4/143 (1962)."   *Alabama and Mississippi Boundary Case,* 470 U. S., at 101–102 (footnotes omitted).

asked to evaluate such a claim to coastal waters. According to the Juridical Regime, an "ancient title" is based on a state's discovery and occupation of territory unclaimed by any other sovereign when it was first acquired. To claim "ancient title" to waters that would otherwise constitute high seas or territorial sea, a state must

> "affir[m] that the occupation took place before the freedom of the high seas became part of international law. In that case, the State would claim acquisition of the area by an occupation which took place long ago. Strictly speaking, the State would, however, not assert a historic title, but rather an ancient title based on occupation as an original mode of acquisition of territory. The difference may be subtle but should in the interest of clarity not be overlooked: to base the title on occupation is to base it on a *clear original title which is fortified by long usage.*" Juridical Regime, at 12 (¶ 71) (emphasis added).

Assuming, *arguendo*, that waters that would otherwise be considered high seas or territorial sea may be claimed under a theory of "ancient title," both parties agree that effective "occupation" must have taken place before the freedom of the high seas became a part of international law. Tr. of Oral Arg. 16–17, 34; Brief for Defendant Massachusetts 4. By this analysis, the title must have been perfected no later than the latter half of the 18th century.[11]

---

[11] One cannot, as a historical matter, point to a precise date on which the international community would have rejected an assertion of sovereignty over Nantucket Sound as contrary to international law. It is clear, however, that such a claim would have become progressively less tenable throughout the 18th century:

"The seventeenth century marked the heyday of the *mare clausum* (closed sea) with claims by England, Denmark, Spain, Portugal, Genoa, Tuscany, the Papacy, Turkey, and Venice.

"In the eighteenth century the position changed completely. Dutch policies had favoured freedom of navigation and fishing in the previous cen-

## III

Although the Special Master discussed "the history of [Nantucket Sound], especially [its] role in the development of the colonial economy of Martha's Vineyard and Nantucket Island," Report 27, his discussion leaves us in doubt whether he felt that "the colonists' exploitation of the marine resources of the soun[d] was equivalent to a formal assumption of sovereignty over" it *before* freedom of the seas became generally recognized. *Id.*, at 58.[12] Because the Commonwealth relied on the same historical evidence to establish

---

tury, and the great publicist Grotius had written against the Portuguese monopoly of navigation and commerce in the East Indies. After the accession of William of Orange to the English throne in 1689 English disputes with Holland over fisheries ceased. However, sovereignty of the sea was still asserted against France, and in general the formal requirement of the salute to the flag was maintained. By the late eighteenth century the claim to sovereignty was obsolete and the requirement of the flag ceremony was ended in 1805. After 1691 extensive Danish claims were reduced by stages to narrow fixed limits. By the late eighteenth century the cannon-shot rule predominated, and claims to large areas of sea faded away." L. Brownlie, Principles of Public International Law 233–234 (2d ed. 1973) (footnotes omitted).

"[I]t is an undeniable fact that, since the days of Grotius, the principle of the freedom of the high seas found an ever wider currency and that, after a gradual evolution, it gained the upper hand towards the beginning of the nineteenth century, when it crystallized into a universally accepted principle of international law." Y. Blum, Historic Titles in International Law § 61, pp. 242–243 (1965).

We find it unnecessary to select a "critical date" upon which the community of states would have rejected a British claim to Nantucket Sound. Because the colonists' activities changed gradually in character and intensity over time, we need say only that effective "occupation" must have ripened into "clear original title," "fortified by long usage," no later than the latter half of the 1700's.

[12] The Special Master discussed this history only as regards "historic" title, see Report 27, even though he recognized that "[e]ffective occupation, from a time prior to the victory of the doctrine of freedom of the seas" is necessary "to establish a valid claim to a body of water under ancient title," *id.*, at 25–26.

both "historic" and "ancient" title, and because "the ultimate responsibility for deciding what are correct findings of fact remains with us" in any event,[13] we have examined for ourselves the pertinent exhibits and transcripts. Our independent review leads us to conclude that the Commonwealth did not effectively "occupy" Nantucket Sound so as to obtain "clear original title" and fortify that title "by long usage" before the seas were recognized to be free.

Massachusetts relies on the colonists' "intensive and exclusive exploitation" of the marine resources of Nantucket Sound to establish occupation. Reply Brief for Defendant Massachusetts 17. At the outset, we have some difficulty appraising the Commonwealth's historical evidence because the cases and publications cited to us uniformly discuss occupation in the context of "historic" rather than "ancient" title. Assuming that the parties are correct in their unspoken assumption that occupation sufficient to establish "historic title" resembles that necessary to acquire "ancient title" as well, and further assuming that such title extends to the whole of the waters of the Sound and is not merely a right to exploit its resources, we believe that occupation requires, at a minimum, the existence of acts, attributable to the sovereign, manifesting an assertion of exclusive authority over the waters claimed.[14] The history of the two most publicized cases conveys the international understanding of occupation.

---

[13] *Colorado* v. *New Mexico*, 467 U. S. 310, 317 (1984). See *Alabama and Mississippi Boundary Case*, 470 U. S., at 101, and cases cited therein.

[14] The Juridical Regime quotes two definitions of "occupation":

"[Occupation] is defined by Oppenheim as follows:

. " 'Occupation is the act of appropriation by a State by which it intentionally acquires sovereignty over such territory as is at the time not under the sovereignty of another State.'

"A similar definition is given by Fauchille:

" 'Generally speaking, occupation is the taking by a State, with the intention of acting as the owner, of something which does not belong to any

In the *Fisheries Case (United Kingdom* v. *Norway)*, 1951
I. C. J. 116, the Permanent International Court of Justice
upheld Norway's use of straight baselines (now approved ex-
pressly by Article 7(6) of the Convention), in part because
Norway had proved a historic claim to the "comparatively
shallow" waters between the mainland and the fringing is-
lands known as the Skjaergaard, or "rock rampart." The
court acknowledged that Norwegian fishermen had exploited
fishing grounds in this region "from time immemorial," *id.*, at
127, and that the King of Denmark and Norway had excluded
fishermen from other states "for a long period, from
1616–1618 until 1906." *Id.*, at 124; see *id.*, at 142.

Of similar effect is the case of *Annakumaru Pillai* v.
*Muthupayal*, 27 Indian L. R. Madras 551 (1903). The com-
plainant in that case was a lessee of the Rajah of Ramnad
who accused the defendant of stealing chanks (mollusks) from
the seabed five miles off the Ramnad coast. The Indian
High Court upheld its own jurisdiction and the liability of the
defendant "upon the immemorial claim of the land sovereign
over this body of water." P. Jessup, The Law of Territorial
Waters and Maritime Jurisdiction 16 (1927) (footnote omit-
ted). The Officiating Chief Judge, relying on historical evi-
dence dating from the 6th century B.C. and explaining the
concessions under which chanks and pearls were historically
gathered by the state's licensees, declared that "it would be
impossible to ignore the fact that for ages in this country,
chanks and pearl oysters have been owned and enjoyed by
the sovereign as belonging by prerogative right exclusively
to him." 27 Indian L. R. Madras, at 557. "And [because]
chanks as well as pearl oysters while still in the beds have
always been taken to be the exclusive property of the sover-

---

other State but which is susceptible of sovereignty.'" Juridical Regime,
at 12 (¶ 70).

On the possible difference between occupation as a mode of original acqui-
sition of territory as contrasted to occupation eventuating in prescriptive
acquisition, see M. Strohl, The International Law of Bays 328, n. 27 (1963).

eign, . . . the fishery operations connected therewith have always been carried on under State control and have formed a source of revenue to the exchequer." *Id.*, at 554. The Officiating Chief Judge concluded that this history demonstrated "exclusive occupation" of "the fisheries in question." *Id.*, at 566.[15]

We have encountered additional examples of claims to title based on exploitation of marine resources—the pearl fisheries in Australia, Mexico, and Columbia, the oyster beds in the Bay of Granville and off the Irish Coast, the coral beds off the coasts of Algeria, Sardinia, and Sicily, and various grounds in which herring, among other fishes, are found. See T. Fulton, The Sovereignty of the Sea 696–698 (1976 reprint of 1911 ed.). The continuation of apparently longstanding state regulation over these fisheries does not contradict, and is indeed perfectly consistent with, the understanding of occupation reflected in the Norwegian and Indian cases just discussed.

In contrast, the historical evidence introduced by Massachusetts does not show effective occupation of Nantucket Sound. To be sure, the Commonwealth's expert witness on the history of the Sound, Dr. Louis DeVorsey, a historical geographer, did conclude that Nantucket Sound was part of an "amphibious resource region" because of the "intimate relationship" between the inhabitants of the area and the surrounding waters.[16] By this Dr. DeVorsey meant essentially

---

[15] Because of a division of opinion between the Officiating Chief Judge and the second judge on the two-judge panel, the case was subsequently heard by a three-judge panel. The later panel unanimously agreed with the judgment of the Officiating Chief Judge and with his historical analysis. See *Annakumaru Pillai* v. *Muthupayal*, 27 Indian L. R. Madras, at 572.

[16] Dr. DeVorsey inferred this intimate relationship in part from 17th- and 18th-century maps naming prominent features and attempting to chart the depths of Nantucket Sound. As Dr. DeVorsey acknowledged, however, none of these maps identified Nantucket Sound as a separate body of water even though they did identify other bodies of water such as Cape Cod Bay, Buzzard's Bay, and, in two instances, Vineyard Sound. These

that the residents took their livelihood from the sea. Although fascinating from a historical geographer's point of interest, the testimony of Dr. DeVorsey and the exhibits introduced through him do not satisfy the legal threshold for occupation of a coastal water body.

To begin with, the opinion that Nantucket Sound formed part of an "amphibious resource region" does not prove occupation of the entirety of Nantucket Sound. That conclusion was based largely on activity which undoubtedly took place either within territorial waters or on dry land. For example, to evidence the colonists' close relationship with the sea, Dr. DeVorsey pointed to the use of sand for glassmaking, stone polishing, and farming. Other activities, such as the building of mills powered by the tide, the making of salt from seawater, and the gathering of seaweed for fertilizer and insulation, also fail to establish occupation of Nantucket Sound. Even considering this evidence together with the more water-based pursuits of harvesting oysters and clams and hunting whales, we do not find sufficient evidence of occupation of Nantucket Sound as a whole. Massachusetts concedes that oysters were dug mainly in the harbors, and for decades the colonists' exploitation of whales was restricted to those that had drifted onto the beach. Although the residents by the mid-18th century had developed a technique for driving whales onto beaches by pursuing them in modified four- to five-man Indian canoes, and they certainly caught shellfish and clams outside the shallow water near shore, there is no satisfactory evidence that these activities occurred over the entirety of Nantucket Sound, and in particular over the portion of the Sound which the United States contends is high seas.

The evidence of occupation adduced by Massachusetts is also deficient because it does not warrant a finding that the

---

early maps do not support Massachusetts' contention that the area's inhabitants established a special relationship with the protected waters of Nantucket Sound as opposed to the surrounding waters and ocean in general.

colonists asserted any exclusive right to the waters of Nantucket Sound. The closest the Commonwealth comes is a 1672 contract by which the town of Nantucket attempted to engage a whaler by the name of Lopar to "follow the trade of whaling on the island" for two years in exchange for, *inter alia*, an exclusive license to hunt whales and 10 acres of land. There is no evidence that the contract was carried out (and in particular no record of a conveyance of real property), and no suggestion in the contract that the license was limited, or even especially concerned with, whaling in Nantucket Sound. Indeed, the contract does not clearly reflect an exclusive proprietary interest in whales anywhere: it may simply represent a covenant on the part of the Nantucket islanders not to compete with the whaling company or companies chartered under the proposed contract. The only other evidence of an assertion of exclusive control was a 1692 Colonial Resolve to build a vessel to protect coastal ships in Vineyard Sound against the depredations of New Yorkers, with whom a dispute was brewing at the time.[17] But this evidence concerning Vineyard Sound merely highlights the lack of any comparable evidence concerning Nantucket Sound. In the absence of evidence limiting use of Nantucket Sound to the inhabitants of its shores, there is no reason to exempt these waters from such rights as innocent passage traditionally enjoyed in common by all members of the international polity.

Even if Massachusetts had introduced evidence of intensive and exclusive exploitation of the entirety of Nantucket Sound, we would still be troubled by the lack of any linkage between these activities and the English Crown. Cf. *United States* v. *Alaska*, 422 U. S. 184, 190–191, 203 (1975). Unless we are to believe that the self-interested endeavors of every seafaring community suffice to establish "ancient title" to

---

[17] The dispute was resolved peacefully, there is no evidence that the vessel was built, and the only other patrol vessel about which Dr. DeVorsey testified was engaged in convoying merchantmen, not in protecting Nantucket Sound.

the waters containing the fisheries and resources it exploits, without regard to continuity of usage or international acquiescence necessary to establish "historic title," solely because exploitation predated the freedom of the seas, then the Commonwealth's claim cannot be recognized. Accordingly, we find that the colonists of Nantucket Sound did not effectively occupy that body of water; as a consequence, Great Britain did not obtain title which could devolve upon Massachusetts.

## IV

Our determination that Massachusetts had not established clear title prior to freedom of the seas is corroborated by the Commonwealth's consistent failure to assert dominion over Nantucket Sound since that time.[18] Three examples should suffice to demonstrate that during the 18th and 19th centuries Massachusetts continued to treat Nantucket Sound in a manner inconsistent with its recent characterization of that body as internal waters.

---

[18] See *Temple of Preah Vihear*, 1962 I. C. J. 6, 61 (separate opinion of Sir Gerald Fitzmaurice) ("It is a general principle of law . . . that a party's attitude, state of mind or intentions at a later date can be regarded as good evidence—in relation to the same or a closely connected matter—of his attitude, state of mind or intentions at an earlier date also; . . . the existence of a state of fact, or of a situation, at a later date, may furnish good presumptive evidence of its existence at an earlier date also, even where the later situation or state of affairs has in other respects to be excluded from consideration" (citations omitted)).

While the position of Massachusetts is discussed in text, it bears mention that the United States did not assert sovereignty over Nantucket Sound either. In 1789 the First Congress established a customs enforcement system, which included a number of separate districts in Massachusetts. The statutory definition of the district of Nantucket included "the island of Nantucket" without any reference to adjacent waters, whereas the district of Edgartown, which included Martha's Vineyard and the Elizabeth Islands, expressly incorporated "all the waters and shores" within Duke's County. Act of July 31, 1789, 1 Stat. 31. This distinction was repeated in subsequent legislation in 1790, Act of Aug. 4, 1790, 1 Stat. 146, and in 1799, Act of Mar. 2, 1799, 1 Stat. 629.

First, in 1847, the Supreme Judicial Court of Massachusetts issued an opinion which is generally understood as having adopted Lord Coke's more demanding version of the line-of-sight test for determining whether jaws of land enclosed inland waters.[19] Since it is agreed that Nantucket Sound could not qualify as inland waters under the Coke test, the Court's decision that that test was part of the common law of Massachusetts supports the further conclusion that the Sound was not part of the internal waters of the Commonwealth.

This conclusion was confirmed in 1859 when the Massachusetts Legislature enacted a statute defining the seaward boundary of the Commonwealth at one marine league (or three nautical miles) from the coast. See Acts of 1859, Ch. 289, Mass. Ex. 53. In accordance with this measure, the statute treated arms of the sea as part of the Commonwealth if the distance between their headlands did not exceed two marine leagues. Thus, the statute replaced the ambiguous line-of-sight test for applying the *inter fauces terrae* doctrine

---

[19] In *Commonwealth* v. *Peters*, 53 Mass. 387, 392 (1847), the Massachusetts high court held:

"All creeks, havens, coves, and inlets lying within projecting headlands and islands, and all bays and arms of the sea lying within and between lands not so wide but that persons and objects on the one side can be discerned by the naked eye by persons on the opposite side, are taken to be within the body of the county."

Chief Judge Shaw's adoption of the Coke test in *Peters* is consistent with Judge Story's earlier exposition in *United States* v. *Grush*, 26 F. Cas. 48, 52 (No. 15,268) (CC Mass. 1829):

"I do not understand by this expression, that it is necessary, that the shores should be so near, that all that is done on one shore could be discerned, and testified to with certainty, by persons standing on the opposite shore; but that objects on the opposite shore might be reasonably discerned, that is, might be distinctly seen with the naked eye, and clearly distinguished from each other."

The parties do not disagree with the Master's conclusion that the American view of the proper test, which followed Coke, differed from the British view, which followed Hale.

with a fixed standard of six nautical miles. Since the distance between Monomoy Point and Nantucket Island is admittedly more than six nautical miles, Massachusett's statutory definition of its own coastline excluded Nantucket Sound.

Finally, in 1881, the Massachusetts Legislature enacted a statute directing its Harbor and Land Commission to prepare charts identifying the boundaries that had been established by the 1859 law. Official charts prepared pursuant to that legislation are consistent with the Master's conclusion that Vineyard Sound was considered part of the Commonwealth, but that Nantucket Sound was not.

It was not until 1971 that Massachusetts first asserted its claim to jurisdiction over Nantucket Sound. There is simply no evidence that the English Crown or its colonists had obtained "clear original title" to the Sound in the 17th century, or that such title was "fortified by long usage." Without such evidence, we are surely not prepared to enlarge the exception in Article 7(6) of the Convention for historic bays to embrace a claim of "ancient title" like that advanced in this case.[20]

The parties are directed to prepare and submit a decree conforming to the recommendations of the Special Master.

*It is so ordered.*

JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[20] The validity of and any limits to the "ancient title" theory are accordingly reserved for an appropriate case. In view of our decision that the history of Nantucket Sound does not support the acquisition of "ancient title" by Massachusetts, we similarly decline to address the question whether the Commonwealth abandoned or renounced that title, and the antecedent issue of under what standard that judgment should be made.