Tamara MONAGHEN, Petitioner,

v.

Steve SIMON, Minnesota Secretary of State, Respondent.

A16-1252

Supreme Court of Minnesota.

Filed: December 21, 2016

Virginia Stark, Stark Law Office, Lindstrom, Minnesota, for petitioner.

Lori Swanson, Attorney General, Nathan J. Hartshorn, Assistant Attorney General, Saint Paul, Minnesota, for respondent Steve Simon.

R. Reid LeBeau II, Michael L. Murphy, Jeffrey K. Holth, The Jacobson Law Group, Saint Paul, Minnesota, for respondent Robert Barrett.

## OPINION

PER CURIAM.

Petitioner Tamara Monaghen filed a petition under Minn. Stat. § 204B.44 (2016), requesting an order directing respondent Steve Simon, the Minnesota Secretary of State, to remove the name of Robert Barrett from the ballot for State Representative for Legislative District 32B at the general election held on November 8, 2016. Petitioner alleged that Barrett did not reside in District 32B for the 6 months immediately preceding the 2016 general election. We referred the matter to a referee to take evidence and make findings of fact. The referee found that petitioner had proven that Barrett did not reside in District 32B during the period between the Fourth of July weekend and August 1, 2016, and that the evidence supported removing Barrett's name from the ballot.

This opinion confirms our order, filed September 8, 2016, granting the petition to the extent it sought an order declaring that Robert Barrett is ineligible to hold the office of State Representative for Legislative District 32B. We denied the petition, however, to the extent it sought an order declaring that Robert Barrett's name be removed from the 2016 general election ballot for the office of State Representative for District 32B.

Petitioner is an eligible voter in Legislative District 32B. She claimed in her petition that Barrett was required to live in District 32B from at least May 8, 2016, to the date of the election, to establish residence as required by the Minnesota Constitution. Petitioner claimed that Barrett did not reside within District 32B at a house on Furuby Road in Taylors Falls, Minnesota (the Furuby house), as Barrett stated in the affidavit of candidacy he filed with the Minnesota Secretary of State. Petitioner claimed that she and others investigated whether Barrett resided at the Furuby house in July 2016 and documented that he did not reside there. We issued an order requiring the Minnesota Secretary of State and Barrett to respond to the petition. Barrett denied the allegations in the petition and moved to dismiss the petition, in part, based on laches. We appointed the Honorable George Stephenson to sit as a referee, hold an evidentiary hearing, and submit findings of fact to our court on whether Barrett had resided in Legislative District 32B for the 6 months immediately preceding the November 8, 2016 general election.

The referee held an evidentiary hearing on August 19, 2016. The testimony presented at the hearing, as well as the exhibits entered into evidence, establish the following. Barrett and his wife own a house in Shafer, Minnesota (the Shafer house), which is outside of District 32B. They pur-

chased this house in 2005.[1] Ms. Barrett resides at the Shafer house. Robert Barrett owns and drives a dark red Honda Civic and a black Dodge truck.

In October 2015, Barrett entered into a 14-month lease for the Furuby house, which is a two-bedroom, single-family residence. The Furuby house is located in District 32B. Barrett paid $300 a month in rent and an average of $30 per month for utilities. The house came sparsely furnished with a sofa, kitchen table, and a chair. Barrett's lease will expire at the end of December 2016. Barrett testified that he would like to buy the Furuby house when the lease expires, but he has not mentioned his interest to the owners, whom he has known for many years.

Barrett testified that he has resided at the Furuby house since October 2015. He said that he slept most nights at the Furuby house and that he made dinner for himself at this house four to five times per week. He testified he was at the Shafer house 4 to 5 days per week, though he stayed overnight at that house only 2 nights per week. When asked if he could explain why petitioner and her witnesses never encountered him when they visited the Furuby house, Barrett testified that he stopped answering his door "for DFL activists that are there to harass me."

Barrett testified that his wife spent 1 to 3 nights per week at the Furuby house until the spring. He acknowledged that since May, his wife had spent fewer nights per week there, and in July and August, she spent 0 to 1 nights per week at the Furuby house. Barrett said that his wife began spending less time at the Furuby

house because she did not feel safe there due to the DFL activists surveilling the property and harassing them. The referee rejected this explanation for why Barrett's wife stopped spending time at the Furuby house because she could not have known about the actions of the DFL activists in May, when she started spending less time there. The referee noted that the DFL activists began the surveillance in July, and Ms. Barrett did not learn about it until August, after the petition was filed.

Barrett did not have internet service, cable or satellite television, or trash pickup at the Furuby house. There was also no washing machine or dryer. Barrett did not have any insurance for the Furuby house. He did not entertain there. Barrett, however, listed the address of the Furuby house on his driver's license and his passport. Barrett also received packages from Amazon at the Furuby house.

Petitioner and two others investigated whether Barrett was living at the Furuby house. Between the weekend of the Fourth of July and August 1, 2016, they made 30 visits to the Furuby house on 15 different days. The visits were as early as 5:50 a.m. and as late as 10:07 p.m. During these visits, no one answered the door when petitioner and the others rang the doorbell or knocked. They did not see any cars in the garage, and they did not see any lights on, except for one occasion when a basement light was on. On many of the visits, a black truck was parked in the same location outside the garage.

During one of these visits, one of the investigators positioned his car so that his high beams illuminated the living room

---

1. Barrett was first elected to represent then-District 17B in 2010. At that time, the Shafer house was located in District 17B. Because of redistricting that occurred in February 2012, District 17B was divided and combined with another district. Barrett decided to run to represent the newly-created District 32B, but the Shafer house was not located in that district. So from April 2012 to 2015, Barrett rented a house in Lindstrom, Minnesota, which is located in District 32B.

window. He saw no furniture and nothing on the living room walls.

Barrett was at the Furuby house at least one time during this period. On July 25, 2016, one of the investigators left DFL campaign literature between the storm door and the front door of the Furuby house. Barrett wrote on the campaign literature and put it back where he found it.

Other evidence suggested that Barrett was at the Furuby house toward the end of July. One investigator noticed on July 29 that the lawn looked like it was freshly mowed. Before July 31, the investigators saw the truck parked outside the garage. On July 31 and August 1, the truck was not there, and the Honda Civic was parked outside the garage.

In early July, petitioner's attorney contacted T.K. about conducting surveillance of the entrance to the driveway leading to the Furuby house. On public land across from the driveway entrance, T.K. positioned a motion-activated camera. He programmed the camera to take two photos if a vehicle stopped at the mailbox or turned into or out of the Furuby driveway. For the periods from July 12 through July 22 and the evening of July 28 through August 1, between the hours of 4 p.m. and 10 p.m., the camera took hundreds of pictures of the entrance to the driveway. Only two of these photos showed a car that looked like Barrett's Honda Civic. These photos, which were taken at 9:30 p.m. on July 15, showed the car stopping at the mailbox. The camera did not capture any images of the car in or entering the driveway that night, or any other night.

The referee concluded that petitioner "proved by clear and convincing evidence that . . . Barrett did not reside in Legislative District 32B during the period between the 4th of July weekend and August 1st, 2016." According to the referee, petitioner established "clearly and convincingly that . . . Barrett did not have the requisite physical presence at Furuby during the requisite period before the election in November." The referee further concluded that "Barrett's expressions of intent to make Furuby his home are simply not credible and are completely at odds with the facts." According to the referee, "Barrett's (and his family's) lack of physical presence at Furuby demonstrate [Barrett's] lack of intent to remain there." By physical presence, the referee not only took into account Barrett's "bodily presence at Furuby," but also "the presence or absence of 'creature comforts' like trash service, internet, cable or satellite television, household appliances, furniture, and pets." The referee also noted that Barrett had no plans to separate from or divorce his wife. And the referee rejected Barrett's claim that he wished to purchase the Furuby house as not credible.

The referee also concluded that "Barrett's claims of occupancy and residency at Furuby challenge credulity." The referee noted that Barrett's explanation for why it appeared that no one was at the Furuby house when petitioner and the others visited "was that he stopped answering the door." The referee rejected that explanation as "simply not credible when viewed with all of the other evidence." According to the referee, Barrett's "testimony was simply not credible."

## I.

We first consider Barrett's argument that we should dismiss the petition based on laches. Laches is an equitable doctrine applied to " 'prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay.' " *Winters v. Kiffmeyer*, 650 N.W.2d 167, 169 (Minn. 2002) (quoting *Aronovitch v. Levy*, 238 Minn. 237, 242, 56 N.W.2d

570, 574 (1953)). We have dismissed election challenges due to laches. *See Larkey v. Ritchie*, No. A12-1064, Order at 2-3 (Minn. filed June 28, 2012); *Clark v. Reddick*, 791 N.W.2d 292, 294–96 (Minn. 2010); *Clark v. Pawlenty*, 755 N.W.2d 293, 303 (Minn. 2008); *Marsh v. Holm*, 238 Minn. 25, 28–29, 55 N.W.2d 302, 304 (1952). " '[T]he practical question in each case is whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for.' " *Winters*, 650 N.W.2d at 170 (quoting *Fetsch v. Holm*, 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952)).

To evaluate the laches argument, statutory provisions that address vacancies in a nomination are relevant. A vacancy in nomination for a partisan office exists when a major political party candidate "is determined to be ineligible to hold the office the candidate is seeking, pursuant to a court order issued under section 204B.44." Minn. Stat. § 204B.13, subd. 1(a)(3) (2016). If such a vacancy in nomination occurs, the party may fill the vacancy "by filing one nomination certificate with the same official who received the affidavits of candidacy for that office." *Id.*, subd. 2(a) (2016).

The timing of the vacancy dictates when the election for this office will occur. If a vacancy in nomination "occurs on or before the 79th day before the general election," the election for the office will occur at the general election. *Id.*, subd. 2(b) (2016). If a vacancy in nomination "occurs after the 79th day before the general election," the office is filled at a special election that will be held "on the second Tuesday in February of the year following the year the vacancy in nomination occurred." *Id.*, subd. 2(c), subd. 7 (2016). The 79th day before the 2016 general election was August 21, 2016.

Barrett filed his affidavit of candidacy on May 31, 2016. Barrett was the only Republican in his district to file an affidavit of candidacy. As a result, there was no primary. *See* Minn. Stat. § 204D.03, subd. 3(a) (2016). Instead, at the close of filing, which was also May 31, 2016, Barrett was declared the nominee. *Id.* Petitioner filed the petition on August 5, 2016.

Barrett argues that the court should dismiss the petition based on laches. Barrett claims that the applicable starting point for a laches analysis should be February 2016, when one of petitioner's witnesses began investigating Barrett's residency, because this person admitted in his testimony that the petition was his idea. And even if this earlier date is not used, Barrett contends that petitioner failed to act in an expeditious manner because she waited 63 days after he filed his affidavit of candidacy to file her petition.

Barrett further argues that petitioner's failure to file the petition in an expeditious manner caused prejudice. If the petition had been brought sooner, Barrett contends that any order from this court declaring him ineligible to run for the office of State Representative for District 32B might have been issued soon enough to allow the election for this office to take place at the November 2016 general election and not at a February 2017 special election. *See* Minn. Stat. § 204B.13, subd. 2(b). Barrett claims that election officials will be prejudiced by being required to hold a special election and that voters will be prejudiced by the delay in selecting their representative through the democratic process.

■ The first step in a laches analysis is to determine if petitioner unreasonably delayed asserting a known right. *Martin v. Dicklich*, 823 N.W.2d 336, 341 (Minn. 2012). Barrett's contention that petitioner's delay should be measured from February

2016, when another person first began investigating his residency, draws the line "too early." *Id.* Even if this person's knowledge should be imputed to petitioner, being aware that Barrett claimed to be living at the Furuby house did not provide petitioner or anyone else with a known right. *See id.* (concluding that when a candidate withdrew from an election after media reports of an incident, those media reports did not provide the petitioners, who wanted a new candidate's name placed on the ballot, with a known right). There could not be a known right to challenge Barrett's eligibility to run for office until he had actually filed to run for that office by filing his affidavit of candidacy, claiming residency within District 32B.

Barrett filed his affidavit on May 31, 2016. We have imputed awareness of information contained in public, election-related documents to the petitioner in other election challenges when evaluating a laches defense. *See Reddick*, 791 N.W.2d at 295 (concluding that petitioner's filing delay of more than 2 months after the availability of public documents identifying the issue petitioner raised as the basis to strike a candidate's name from the ballot was unreasonable). Applying that principle here, petitioner had a known right to challenge Barrett's residency as of May 31, 2016, when Barrett filed his affidavit of candidacy stating that he resided at the Furuby house.

Petitioner waited approximately 2 months after this date to file the petition. Some of that delay may be excused because the challenger to a residency claim bears the burden of proof, *see Moe v. Alsop*, 288 Minn. 323, 330–31, 180 N.W.2d 255, 260 (1970). Accordingly, before petitioner could file her petition, she needed to know more than where Barrett claimed to be residing. Petitioner needed evidence to prove that Barrett was not residing in the district, and to gather that evidence, petitioner needed time to investigate. On the other hand, she did nothing in June to investigate Barrett's residence.

Even if that delay was unreasonable, which we need not decide, the prejudice that will result from this delay is substantially less than the prejudice that existed in other cases in which we dismissed a petition based on laches. *See Larkey*, Order at 2-3 (dismissing a petition that was filed 4 days before ballots had to be available to voters when the ballots had already been printed at the time the petition was filed and it was impossible for election officials to make the ballots available by the time required by law even if the court were to grant the petition); *Reddick*, 791 N.W.2d at 295–96 (dismissing a petition based on laches that sought to strike a candidate's name from the ballot when oral argument was held after the date on which ballots were required by law to be made available to voters and there was no evidence in the record that one of the counties that lay within the district had delayed sending their ballots to the printer); *Clark*, 755 N.W.2d at 301–02 (dismissing the portion of a petition seeking to strike a judicial candidate's name from the primary ballot and finding significant prejudice, in part, because ballots had already been printed and sent to and returned by some absentee voters; "it [was] undisputed" that if the candidate's name was struck and ballots had to be reprinted, election officials could not take all required action before the primary; and granting the relief would lead to other ballot modifications needing to be made throughout the state for other judicial races before the primary).

Barrett's prejudice arguments are based primarily on the fact that if we granted the petition, the election for House Representative for District 32B would take place at

a special election in February 2017, and not at the general election in November 2016. We have said that we will consider "the prejudice that ... result[s] to ... election officials, other candidates, and the Minnesota electorate in general." *Clark*, 755 N.W.2d at 301. By enacting section 204B.13, the Legislature has chosen, as a matter of policy, the remedy of a special election if we declare that a major political party's candidate for a partisan office is ineligible to run for the office after the 79th day before the election. Although the public will bear the costs of a special election, this remedy preserves the right of the major political parties to nominate a candidate for the office and the voters' choice of eligible candidates at the election for this office. It also gives election officials ample time to prepare for the special election without causing disruptions to the other elections taking place on the day of the general election. No comparable statutory remedy existed in the other cases in which we dismissed an election challenge based on laches. Even if petitioner unreasonably delayed in bringing the petition, the availability of the remedy in Minn. Stat. § 204B.13 mitigates any prejudice. We therefore decline to dismiss the petition based on laches.

## II.

■ We turn next to Barrett's objections to the referee's conclusion that petitioner proved by clear and convincing evidence that Barrett did not reside in Legislative District 32B during the period between the Fourth of July weekend and August 1, 2016. The Minnesota Constitution dictates that "representatives shall be qualified voters of the state, and shall have resided ... six months immediately preceding the election in the district from which elected." Minn. Const. art. IV, § 6. For this case, this 6-month period was May 8, 2016, through November 8, 2016.

■ The party challenging the residency of a legislative candidate bears a heavy burden to prove the candidate is ineligible. *Moe*, 288 Minn. at 330–31, 180 N.W.2d at 260 ("The burden upon the applicant to establish ineligibility must be a heavy one in view of the drastic nature of an affirmative order, both to the candidate and to the electorate."). "[T]he factors that establish residency 'are largely questions of fact, and we therefore defer to the findings of the referee who heard the witnesses testify.'" *Studer v. Kiffmeyer*, 712 N.W.2d 552, 558 (Minn. 2006) (quoting *Piepho v. Bruns*, 652 N.W.2d 40, 44–45 (Minn. 2002)).[2] In addition, "we have emphasized that '[i]t is the role of the referee, and not this court, to evaluate the credibility of witnesses.'" *Id.* (quoting *Lundquist v. Leonard*, 652 N.W.2d 33, 37 (Minn. 2002)).

■ In deciding whether a legislative candidate has resided in the district from

---

**2.** Barrett argues that we should not defer to the referee's findings and instead should independently scrutinize the record and determine if petitioner met her heavy burden of proving that he did not reside in District 32B. As support, Barrett cites to a concurrence from *Studer*, 712 N.W.2d at 560 (Anderson, G. Barry, J., concurring) (concluding that when assessing a challenge to the residency of a legislative candidate, the court should "conduct[] an 'independent review' of the record ... 'because the "ultimate responsibility for deciding what are correct findings of fact

remains with [the Court]"'" (quoting *United States v. Maine*, 475 U.S. 89, 98, 106 S.Ct. 951, 89 L.Ed.2d 68 (1986))). We deferred to the referee's findings in *Studer*, as we had done in prior election cases challenging a legislator's residency. *See* 712 N.W.2d at 558. Barrett offers no compelling reason for us to overturn our precedent on this issue. *See Schuette v. City of Hutchinson*, 843 N.W.2d 233, 238 (Minn. 2014) ("We are extremely reluctant to overrule our precedent absent 'a compelling reason.'" (quoting *State v. Martin*, 773 N.W.2d 89, 98 (Minn. 2009))).

which elected, we "focus on physical presence and intent, as we have done in the voter residency context." *Piepho*, 652 N.W.2d at 44; *see also Studer*, 712 N.W.2d at 557. Neither physical presence nor intent "is determinative," and "each informs the other." *Piepho*, 652 N.W.2d at 44. Accordingly, "intent can be demonstrated in many ways, including but not limited to physical presence, and we consider physical presence to the extent that it manifests intent to reside in the district." *Id.*

Barrett argues that the referee improperly concluded that petitioner met her heavy burden to prove that he did not reside in District 32B. Barrett claims that the referee improperly relied on unreliable surveillance evidence. Barrett also contends that the referee exaggerated the evidentiary value of the visits made by petitioner and the others because too many of their visits occurred on the same days and were made at a time most people are driving to or from work or are running errands and socializing.[3]

Petitioner argues that the referee correctly applied the law to the facts of this case and that there was no abuse of discretion in his findings of fact. According to petitioner, the evidence she presented established that the Furuby house "is not Mr. Barrett's 'home'—it is an address, and he has no intention to remain there." Petitioner argues that it is "not sufficient to establish legal residency by simply signing a lease for a rental house, and not living there." [4]

The referee concluded that Barrett did not reside in his district for approximately 30 days, from the Fourth of July weekend through August 1, 2016. There is evidentiary support for that conclusion. With respect to physical presence, circumstantial evidence demonstrates that Barrett had little physical presence at the Furuby house and was not actually living there during the period from the Fourth of July weekend through August 1. Barrett owns a home outside of District 32B at which his wife resides. Barrett himself testified that he does not "spend a lot of time on Furuby Avenue" due to his work and campaign schedules. During this period, petitioner and others working with petitioner made 30 visits on 15 days to the Furuby house, yet they never encountered anyone, nor were there signs that anyone was currently home.[5] Contrary to Barrett's claim, they visited at times of the day that people are often home. On 11 different days, they made 12 visits after 9 p.m., and Barrett testified that he was home in the evenings. During this same period, the surveillance camera was operational for 15 days. Only two of the camera's photos showed Barrett's Honda Civic near the mailboxes, and no photos showed the car in or entering the driveway. And during this time, there did not appear to be any furniture in the living room of the house.

It is true that Barrett claimed that he was actually residing at the Furuby house during this period, but he chose not to

---

**3.** Barrett also faults the referee for referencing in his order proceedings involving a residency challenge to Barrett's candidacy in 2014. We agree with Barrett that the determination to be made here is whether Barrett resided in Legislative District 32B during the period from May 8 through November 8, 2016.

**4.** The Secretary of State takes no position on the referee's findings.

**5.** In Barrett's objections to the referee's findings of fact and his informal memorandum accompanying those objections, Barrett makes incorrect factual statements about these visits. He incorrectly states the number of days the visits occurred, the number of days with more than one visit, how many visits occurred on those days, and the number of days with a single visit.

answer the door when petitioner and others acting on her behalf knocked. The referee, however, rejected Barrett's claim as not credible. We defer to this credibility determination. *See Studer*, 712 N.W.2d at 558.

The referee also concluded that Barrett did not intend to remain at the Furuby house during the period from the Fourth of July weekend through August 1, 2016. The referee properly relied on Barrett's lack of physical presence at the Furuby house when making this finding. *See Piepho*, 652 N.W.2d at 44 (stating that "physical presence is an appropriate consideration in determining intent to reside in the district"). The referee also found that Barrett did not act like he intended to remain at the Furuby house. *See In re Karasov*, 805 N.W.2d 255, 266–67, 266 n.7 (Minn. 2011) (stating that "[i]ntent ... is often proved circumstantially by looking at a person's conduct and inferring from that conduct a person's mental state" and concluding that the judge's conduct was relevant to determine whether she intended to reside at a particular location). The Furuby house lacked basic items that people have at a place where they intend to remain and reside, such as trash pickup, internet service, cable or satellite television, a washer and dryer, and basic furniture. Barrett also failed to do things at the Furuby house that a person typically does at the place they intend to reside and make their home. There is no evidence that his wife spent time at the Furuby house during the relevant period, and Barrett never entertained there. The referee also rejected Barrett's claim, as not credible, that he was interested in buying the Furuby house. In sum, the referee rejected as not credible Barrett's contention that he intended to reside at the Furuby home.

Based on this analysis, the referee determined that Barrett did not reside in his legislative district during the period from the Fourth of July weekend through August 1. In urging us to set aside this determination, Barrett argues that the evidence he presented in this case was similar to other legislative-candidate residency challenges we have rejected. More specifically, he argues that the evidence he presented of his residency is nearly identical to the evidence in *Piepho*, 652 N.W.2d at 45–46, and *Lundquist*, 652 N.W.2d at 36–37, both of which denied section 204B.44 petitions challenging the residency of legislative candidates and instead concluded that the candidates had shown residency in their respective legislative districts for the 6-month period before the election. Barrett argues that, like the candidates in these cases, he rented a place to live within his legislative district, listed that place as his address on his driver's license, and received mail there.

These cases, however, are distinguishable. Most importantly, in each case, the referee credited the candidate's testimony about residency, *see Piepho*, 652 N.W.2d at 44–45; *Lundquist*, 652 N.W.2d at 37. In this case, by contrast, the referee rejected Barrett's testimony as not credible.

The cases Barrett cites are also factually inapposite. *Piepho* involved a residency challenge to a sitting legislator who no longer lived in his district because of redistricting and who needed to move in a short period of time if he wanted to run for reelection in the district where most of his current constituents resided. 652 N.W.2d at 42, 45 (explaining that "[r]edistricting provides further context for the referee's findings" and that "[t]here were just 47 days" between the day the redistricting plan was announced and the beginning of the 6-month period before the general election). The petitioner only challenged the legislator's physical presence in the new district for the first few weeks of the

6-month period. *Id.* at 45. We concluded that, because of the redistricting, "it is reasonable to expect that the candidate's accommodations may appear temporary in light of the difficulty of finding housing on short notice." *Id.* Barrett, however, was not forced to move in a hurry because of redistricting.

*Lundquist* is likewise factually inapposite. In that case, although the candidate owned a home outside the legislative district, it was undisputed that she had an apartment in the legislative district at which she and her daughter spent most nights of the week. 652 N.W.2d at 34–35 (explaining that the candidate moved from a home outside the district to an apartment within the district on May 5, 2002, and that "she and her 17-year-old daughter stayed there about six nights per week in May").

In short, because there is factual support in the record for the referee's findings, we defer to them. *Studer*, 712 N.W.2d at 557. Consequently, because Barrett was not a resident of District 32B for the 6 months prior to November 8, 2016, we hold that he was ineligible to run for legislative office in that district.

### III.

▮ Finally, we address the relief to which petitioner is entitled based on our conclusion that Barrett was ineligible to run for the office of State Representative for Legislative District 32B. Petitioner asked the court to remove Barrett's name from the 2016 general election ballot. Minnesota law does not provide for the removal of a candidate's name from the ballot in the circumstances present in this case. Barrett was the nominee of a major

political party for a partisan office. An order from this court declaring Barrett to be ineligible to hold the office he seeks creates a vacancy in nomination that invokes the procedures in Minn. Stat. § 204B.13 (2016).

A vacancy in nomination for a partisan office exists when a major political party candidate "is determined to be ineligible to hold the office the candidate is seeking, pursuant to a court order issued under section 204B.44." *Id.*, subd. 1(a)(3). If a vacancy in nomination "occurs after the 79th day before the general election," the general election ballot remains unchanged, and the county and state canvassing boards "must not certify the vote totals for that office from the general election." *Id.*, subd. 2(c). Instead, "the office must be filled at a special election held" in "February of the year following the year the vacancy in nomination occurred." *Id.*, subds. 2(c), 7. "[N]o later than seven days after the general election," the major political party may fill the vacancy in nomination "by filing one nomination certificate with the same official who received the affidavits of candidacy for that office." *Id.*, subd. 2(a), (c).[6]

We determined in our September 8, 2016 order that Barrett was ineligible to run for the office of State Representative for Legislative District 32B. The vacancy in nomination that resulted from our determination that Barrett did not meet the constitutional residency requirement occurred less than 79 days before the general election on November 8, 2016. Under Minn. Stat. § 204B.13, we determined that Robert Barrett's name should not be removed from the 2016 general election ballot. Instead, we held that the county and

---

6. At oral argument, petitioner contended for the first time that Minn. Stat. § 204B.13, subds. 2(a), 2(c) and 7, are unconstitutional. We decline to address these arguments. *See In* *re Stoneburner*, 882 N.W.2d 200, 203 n.3 (Minn. 2016) (refusing to address an issue raised for the first time at oral argument).

state canvassing boards must not certify the vote totals for the office of State Representative for Legislative District 32B from the 2016 general election, and the representative from District 32B must be selected at a special election that will be held on February 14, 2017.

As a result, the petition is granted in part and denied in part. The petition is granted to the extent it sought an order declaring that Robert Barrett is ineligible to hold the office of State Representative for Legislative District 32B because he did not reside in that district for the 6 months preceding the November 8, 2016 general election. The petition is denied to the extent it sought an order declaring that Robert Barrett's name be removed from the 2016 general election ballot for the office of State Representative for District 32B.

Petition granted in part and denied in part.

Concurring, Anderson, J.

### CONCURRENCE

ANDERSON, Justice (concurring).

I join in the result reached in the majority opinion but write separately to restate the concerns I previously expressed in *Studer v. Kiffmeyer*, 712 N.W.2d 552 (Minn. 2006), regarding the appropriate level of deference to grant to the referee's findings.

We have original jurisdiction over cases challenging the residency of candidates for election to the Minnesota Legislature under Minn. Stat. § 204B.44 (Supp. 2015). As I said in my concurrence in *Studer*, I conclude that the United States Supreme Court's approach applies the appropriate level of deference in cases utilizing a referee in legislative residency disputes. 712 N.W.2d at 560 (Anderson, G. Barry, J., concurring). In cases in which we exercise

original jurisdiction, we may appoint a referee to hear evidence and make recommendations. *See Colorado v. New Mexico*, 467 U.S. 310, 312–13, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (noting that the Court appointed a special master to take evidence in a matter brought under the Court's original jurisdiction). But the referee's recommendations are not binding and should not be entitled to deference. After we review the referee's recommendations, we should conduct an independent review of the record and reach our own conclusion on the outcome of the case "because [we have] 'the ultimate responsibility for deciding what are correct findings of fact.'" *United States v. Maine*, 475 U.S. 89, 98, 106 S.Ct. 951, 89 L.Ed.2d 68 (1986) (quoting *Colorado*, 467 U.S. at 317, 104 S.Ct. 2433). To the extent the majority suggests otherwise, I do not agree.

Unlike other situations in which we appoint referees to make factual findings, legislative residency disputes involve a coordinate branch of government, and our court, not a single appointed referee, should retain the ultimate responsibility to independently review the record. We may, in appropriate circumstances, choose to defer to the referee's factual findings, particularly with respect to credibility issues, but whether we choose to do so in disputes challenging the residency of legislative candidates depends on the circumstances of each case.

Further, I am less certain than the majority of how soundly grounded the principle of deference is in our case law. The majority contends that "[w]e deferred to the referee's findings in *Studer*"; however, in *Studer* we did not actually defer to the referee's findings. Rather, we stated that "the factors that establish residency 'are largely questions of fact, and we therefore defer to the findings of the referee who heard the witnesses testify.'" 712 N.W.2d

at 558 (quoting *Piepho v. Bruns*, 652 N.W.2d 40, 44–45 (Minn. 2002)). But, we then determined that "[t]he record fully support[ed] the referee's findings." *Id.* at 559. Similarly, in *Piepho*, we reviewed the findings of the referee and determined that the "findings support[ed] the conclusion that [the candidate] had sufficient presence in [the district] and intent to reside there to meet the residency requirement." 652 N.W.2d at 45. What the majority here calls deference in these cases appears to me to be an independent review of the referee's findings.

Like in *Studer*, here the evidence was overwhelming so it is not necessary to determine what deference, if any, we should grant to the referee's findings, and I therefore concur in the majority opinion.